

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2005

# Hubbard v. Taylor

Precedential or Non-Precedential: Precedential

Docket No. 03-2372

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Hubbard v. Taylor" (2005). *2005 Decisions.* Paper 1500.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1500

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-2372

GREGORY HUBBARD; ALVIN PHILLIPS;
JULIAN PAYNE; CURTIS GIBBS;
GREGORY J. BOLLING; LEONARD GARNER;
GREGORIO TOMAS; DESMOND BROWN;
THELLIE CHAMBLEE; SPUD M. BURNS, JR.;
ROBERT WARD; CHRISTOPHER VAVALA;
KRISTOFER JACKSON; TIMOTHY THOMAS;
PAUL C. WOODWARD; JOSEPH MICHAEL CREEGAN,
JR.; JAVARI WILLIAMS; FLOYD HUNT; BRYANT
CHARLES; CLAUDE JONES; EDDIE A. CARTER;
THEODORE JACKSON; ANDRE MURRAY; ATIF
MOHAMMAD; PEDRO RIVERA, JR.;
ANDREW P. BLAKE; LINWOOD WILSON;
WILLIAM T. DAVIS; WILL T. GRAHAM;
KEVIN M. AGNEW; NOEL SANTIAGO;
WALTER KRAUSE, III; BARRY J. GREEN;
WEDUS MADDOX, a/k/a Wedus Moddo;
RAYMOND STEVENS; JAMES A. WILSON;
MATTHEW MAJOR, JR.; PERCY OSBORNE;
KEVIN KETCHUM,

Appellants

v.

STANLEY TAYLOR, Commissioner;
RAPHAEL WILLIAMS, Warden;
M. JANE BRADY, Attorney General

Appeal from the United States District Court
for the District of Delaware
(Civ. No. 00-cv-00531)
District Judge: Hon. Sue L. Robinson

Argued: February 12, 2004

Before: SCIRICA, *Chief Judge*, ROTH and
McKEE, *Circuit Judges*

(Opinion filed: February 23, 2005 )

PAUL E. CRAWFORD, ESQ. (Argued)
HELENA RYCHLICKI, ESQ.
Connolly Bove Lodge & Hutz
P.O. Box 2207
Wilmington, DE 19899
*Attorneys for Appellants*

RICHARD W. HUBBARD, ESQ. (Argued)
GREGORY E. SMITH, ESQ.
Deputy Attorneys General
State of Delaware
Department of Justice
820 North French Street, 6th Floor
Wilmington, DE 19801

*Attorneys for Appellees*

**OPINION**

McKEE, *Circuit Judge*.

Pre-trial detainees housed at a correctional facility in Delaware ask us to review the district court's grant of summary judgment in favor of prison officials and the state's Attorney General. The detainees claim that certain conditions of their confinement deprive them of liberty without due process of law in violation of the Fourteenth Amendment. Inasmuch as we conclude that the district court improperly analyzed their claim under the Eighth Amendment, rather than the Due Process Clause of the Fourteenth Amendment, we will reverse and remand for an appropriate due process analysis.

## I. FACTS

The Multi-Purpose Criminal Justice Facility commonly known as "Gander Hill," is located in Wilmington, Delaware. It was constructed in 1982 and enlarged when a new wing was added in 1992. Stanley Taylor has been the Commissioner of the Delaware Department of Corrections (the "DOC") since the fall of 1995, Raphael Williams is the warden at Gander Hill, and M. Jane Brady is the Attorney-General of Delaware.

On May 30, 2000, a number of pre-trial detainees at Gander Hill filed a handwritten *pro se* complaint against Taylor, Williams, and Brady. The suit was brought under 42 U.S.C. § 1983 and alleged that various conditions of the detainees' confinement violated the Due Process Clause of the Fourteenth

Amendment.[1] An amended complaint was filed following appointment of counsel. The amended complaint sought declaratory and injunctive relief, damages, attorneys' fees and costs; and it added Kevin Ketchum and Percy Osbourne as plaintiffs. Like the original plaintiffs, Ketchum and Osbourne alleged a due process violation based upon conditions of their confinement, but they added a claim under the Americans with Disabilities Act.[2]

Pre-trial detainees are housed in the West Wing of Gander Hill, and convicted inmates are generally housed in the East Wing.[3] The typical West wing modular unit or "pod"

---

[1] The complaint also named the Delaware Department of Corrections as a defendant. The Department moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) arguing that it was immune from suit under the Eleventh Amendment. The district court granted that motion and the plaintiffs have not appealed that ruling.

[2] For clarity, we will refer to the pre-trial detainees collectively as "plaintiffs" and refer to Osbourne and Ketchum individually. It is not clear whether Ketchum and Osbourne are pre-trial detainees or convicted inmates; however the amended complaint prays for relief based upon plaintiffs' status as pre-trial detainees. We therefore must analyze their claims on that basis.

[3] In their brief, the defendants suggest that at least some of the plaintiffs may actually be convicted inmates and not pre-trial

4

contains two housing units connected by a control room from which correctional officers can observe the two units. Each unit contains a large dayroom of approximately 3,900 square feet, containing a sink, tables, chairs and a television. Twenty cells surround the dayroom. With some minor variation, they are all approximately the same size.

## A. The Conditions of Confinement Claim.

Plaintiffs' conditions of confinement claim rests upon

---

detainees. As we will explain, that classification determines the analysis that applies to the conditions of confinement claim. Defendants state: "[d]ue to the extensive criminal history of the Plaintiffs and their lack of memory, it is difficult to ascertain whether any of them was a detainee or a sentenced inmate during any particular period of incarceration at Gander Hill. Many of them were jailed for new crimes and violations of probation or parole for a previous crime." Appellees' Br. at 2., n.3.

However, it is difficult to determine if defendants are sincerely challenging plaintiffs' classification as pre-trial detainees or merely attempting to undermine the merits of their claims by disparaging plaintiffs' character. The defendants concede that pre-trial detainees are housed in the West wing, where the challenged conditions exist. The defendants state: "[t]he Amended Complaint is focused specifically on the West wing. . . and the gymnasium. Generally, detainees are housed in the West wing and sentenced inmates are housed in the East wing." *See* Appellees' Br. at 6.

their challenge to the practice of housing three detainees in cells intended and designed for one person ("triple-celling").[4] Plaintiffs claim that triple-celling requires someone to sleep on a mattress that must be placed on the cell floor adjacent to a toilet. Plaintiffs allege that this violates the Fourteenth Amendment by depriving them of their liberty without due process of law.[5]

The defendants concede that an inmate must sleep on a floor mattress when three are housed in a given cell. When that happens, the newest arrival is required to sleep on a mattress on the floor until one of his cellmates is released or moved. That frees a bunk for the inmate who had been on the floor mattress, and any new arrival in that cell would then take his place on the

---

[4]In their amended complaint, plaintiffs allege a number of other unconstitutional conditions of confinement including: being housed in the gym and fitness center because of overcrowding; cold food; lack of access to the law library; frequent lockdowns resulting in confinement in cells for 8 to 16 hours a day; inadequate access to medical care; and deliberate indifference to prisoners' conditions by failing to provide basic necessities of life, including health care, exercise, personal safety, food and habitable space. *Hubbard v. Taylor*, 2003 WL 1697537 at *1 (D.Del. March 28, 2003). However, in the district court, the plaintiffs limited their claim to being required to sleep on mattresses on the floor. *Id.* at *4.

[5] Prison officials began triple celling in 1999.

floor mattress.[6]

The cells range in size from 69 to 76 square feet, and the net unencumbered space in the cell (gross footage of 69-76 square feet less space required for a bed, mattress, desk and toilet) is less than 50 square feet or 16 square feet per occupant of each tripled cell. Plaintiffs claim that the bunk bed and floor mattress leave extremely limited space for three adult men to move about in the cell. They claim that these cramped conditions have caused injuries including some as serious as a broken leg. For example, Darrin Moon was a detainee at Gander Hill in June 2000. He claims that his leg was broken when a cellmate jumped off the bunkbed in the middle of the night and landed on Moon's leg. Another detainee, Gregory Bolling alleges a similar mishap. Bollling claims he sustained numerous injuries including an infected shin as a result of attempting to navigate the one foot clearance between the bunkbed and his cellmate's mattress,

Plaintiffs claim that the deprivations are exacerbated because sleeping on the floor forces detainees to sleep very near the open toilet. This has purportedly resulted in urine and feces regularly splashing on whomever is relegated to the floor mattress. For example, detainee Gregory Hubbard stated, "one of the primary things that I felt was degrading was the sleeping on the floor and having to sleep on the floor next to a urinal or toilet as long as I did when other arrangements could have been

---

[6] The mattress can be placed under the lower bunk during the day.

made to provide me with a bunk like the other two individuals in my room."

Plaintiffs claim that pre-trial detainees typically spend a minimum of 2 months, and most spend 3 to 7 months, sleeping on a floor mattress before a cellmate leaves and a bunk becomes available. They also argue that they have to deal with the extreme discomfort and disease associated with sleeping on a concrete floor. According to them, a Prison Facilities Audit supports their claim that the foam mattresses provided by the prison officials are thin, worn-out and filthy. The Prison Facilities Audit described the conditions in pertinent part as follows:

> In most housing units – many mattresses are used on the floor without protective covers. Since the institution does not have mattress sanitizing facilities, some sort of protective cover should be used. If covers are not feasible, then perhaps a sheet of plastic or a cloth sheet should be placed on the floor to help keep the mattress clean.

Plaintiffs insist that conditions were no better five months later when a report noted that "[t]here are no facilities available for cleaning of those mattresses." Still later, in May 2001, the unsanitary conditions were purportedly still being noted in the official internal reports. According to plaintiffs, these floor mattresses were not only unsanitary, they were also so thin, worn and uncomfortable that sleeping on them was tantamount to actually sleeping on the bare floor.

8

Plaintiffs insist that prison officials could have prevented "triple bunking"[7] and its associated problems. They claim that these problems would have been avoided had Commissioner Taylor added the additional 2500 beds that had been envisioned as part of a "Master Plan" that was devised in response to litigation that has been ongoing for 20 years. The earliest suit was filed in March 1980 and was resolved in a 1988 Settlement Agreement. There, prison officials agreed to stop "double bunking" and return to placing a single inmate in cells at state prisons. *Dickerson v. Castle*, Civ. Act. No. 10256, Delaware Court of Chancery. However, plaintiffs claim that the additional beds were never occupied because prison officials failed to train enough correctional officers to properly respond to an increase in the prison population. Thus, in plaintiffs' view, the prison officials are responsible for the overcrowded conditions at Gander Hill.

## B. The Americans With Disabilities Act Claim.

As noted above, the amended complaint added the ADA claims of Kevin Ketchum and Perry Osbourne. However, Osbourne has since died of cancer and the plaintiffs concede

---

[7]This term is misleading. "Triple bunking" actually refers to confining three people in a cell with each being provided with a permanent bunk-type bed. *See Union County Jail Inmates v. BiBuono*, 713 F.2d 984, 994 n.12 (3d Cir. 1983). As we have explained, in Gander Hill, two detainees have bunk beds and the third has to sleep on a mattress on the floor. Accordingly, we refer to the practice as "triple-celling." *Id.*

that his death moots his claim. Ketchum has end-stage renal failure and loss of kidney function. He has been on dialysis since 1994 and allegedly requires a kidney transplant that officials purportedly refuse to facilitate.[8] However, he can not receive a kidney transplant unless he is first placed on the transplant waiting list maintained by the United Network for Organ Transplants ("UNOS").

According to plaintiffs, Ketchum has been petitioning prison officials to start the process for getting a kidney transplant since 1977 when he first asked them to release documents so that he could be placed on the transplant list as his physician recommended. According to plaintiffs, Ketchum has a compelling need to get on the transplant list quickly because he is reaching the outer limits of the time he can tolerate dialysis.[9]

## C. The Defendants' Response.

Gander Hill receives approximately 18,000 admissions

_____

[8] The plaintiffs claim that Delaware law requires that inmates be afforded medical care without regard to cost. *See* 11 Delaware Code § 6536(b) ("an inmate shall not be refused medical treatment for financial reasons. . . .").

[9] Ketchum has apparently been confined at Gander Hill since 1997. We therefore assume that he is a convicted prisoner, and not a pre-trial detainee. However, as we have noted above, the amended complaint seeks redress for conditions of confinement of plaintiffs as pre-trial detainees. *See* note 2, *supra*.

per year, and the defendants maintain that neither Taylor nor the warden have any control over that number. The officials concede that triple-celling is used at Gander Hill, and that this forces some detainees to sleep on a floor mattress. However, they deny that the mattresses are adjacent to toilets. Officials claim that there is ample room to arrange a mattress so that the toilet is at the resident's foot and several feet away. Thus, say the defendants, there is no reason for anyone to worry about unsanitary and unhealthy conditions as a result of sleeping on the floor. They draw support for their position from the deposition testimony of detainees Moon and Wilson.

> Moon testified in relevant part as follows:
> I chose to sleep with my head towards the window and my feet towards the toilet. Let's say, from my waist down where their beds are. Because if I slept the other way, and somebody used the bathroom, I would have to worry about him standing over top of me and water and urine splashing over me.

The officials note that Moon did not say that urine and feces splashed on him as plaintiffs' claim suggests. Rather, he only said that he worried about that happening. Moon also stated that he could address that concern by simply sleeping with his head away from the toilet.

Defendants also cite the exchange during detainee Wilson's deposition that defendants claim further demonstrates that plaintiffs' claims are exaggerated:

11

Q: So it is your contention that you're not being treated like a human being?

A: On that west side? Yes, sir. If you got to sleep down beside the toilet and feces and you got to use the bathroom when the C.O. not come in and there's a couple other inmates in there with you; yes. Yes. Food cold. Whew. Yes.

Officials point out that Wilson did not say that urine and feces splashed on him either. Rather, he said that he had to "sleep down beside the toilet and feces." The defendants argue that it can be assumed that any feces remained inside the toilet and they note that Wilson's testimony is not to the contrary. The defendants also point out that even if one assumes Wilson was sleeping with his head next to the toilet, the record does not explain why he chose to sleep in that position when he apparently did not have to.

Moreover, according to the defendants, the detainees who must sleep on floor mattresses are not near the toilets in any event. In his affidavit, Acting Deputy Warden Phelps claims that most mattresses in cells in the West Wing of Gander Hill are two and one-half feet from the toilet. Although plaintiffs estimate that distance, Phelps actually measured it and Moon's testimony is not inconsistent with Phelps' testimony because Moon did not specify a distance. Moreover, defendants point out that the record further undermines plaintiffs' claims of disease because Moon's deposition is the only record of disease and he only testified that he caught a cold.

12

As noted earlier, the plaintiffs allude to official records that purportedly documented allegations regarding old and dirty mattresses. The defendants claim that this is a distortion. According to defendants, plaintiffs fail to mention that those mattresses were replaced after prison officials realized the condition the old mattresses were in.

The defendants refute Ketchum's ADA claim by noting that Ketchum never suffered any injury while in the care of the DOC and that Ketchum's own physician disapproved his placement on the kidney transplant list. According to the defendants, the plaintiffs admitted in the district court that Ketchum's own physician and the prison health care provider told Ketchum that he was not eligible for the National Transplant List. Furthermore, defendants claim that Ketchum admitted that the Chief of the Bureau of Prisons told him that the DOC would pay for a transplant if the doctors said it was medically necessary.

## II. DISTRICT COURT PROCEEDINGS

The district court issued a Memorandum Order granting summary judgment to the prison officials on both claims. The court also denied a motion for class certification that plaintiffs had filed in an attempt to represent a class of over 3,000 pre-trial detainees. *See Hubbard v. Taylor*, 2003 WL 1697537 (D.Del. March 28, 2003).[10] This appeal followed.[11]

---

[10]The district court's opinion contains a discussion of the conditions of confinement claim. However, it does not contain

# III. DISCUSSION[12]

## A. Applicable Legal Principles.

The Supreme Court first discussed the application of the Due Process Clause to pre-trial detainees in *Bell v. Wolfish*, 441 U.S. 520 (1979). There, federal pre-trial detainees claimed that a number of the conditions of their confinement violated various provisions of the Constitution. The challenged conditions included the practice of confining two inmates in a cell intended and designed for one. That practice was the only condition that implicated their due process rights. 441 U.S. 530.[13]    In

any discussion of the ADA claim.

[11] Plaintiffs have not appealed the district court's refusal to certify the putative class. That issue is, therefore, not before us.

[12]We exercise plenary review over the district court's grant of summary judgment. *Caprio v. Bell Atlantic Sickness and Accident Plan*, 374 F.3d 217, 220 (3d Cir. 2004). In reviewing the grant of summary judgment, we must view the facts in the light most favorable to appellant and affirm only if there was no genuine issue as to any material fact and appellees are entitled to judgment as a matter of law. *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002).

[13] The Fifth Amendment Due Process Clause was implicated in *Bell* because the plaintiffs were federal pre-trial detainees. Inasmuch as we are here concerned with state pre-trial detainees, any applicable constraints must arise from the Due

14

resolving the issue, the Court stated:

> [i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process, we think that the proper inquiry is whether those conditions amount to punishment prior to an adjudication of guilt in accordance with law. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

*Id*. at 535 (citations omitted). Of course, the government "may . . . incarcerate a person charged with a crime but not yet convicted to ensure his presence at trial[.]" *Id*. at 531. "Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial[.]" *Id*. at 537. There nevertheless remains "a distinction between punitive measures that may not be constitutionally imposed prior to a determination of guilt and regulatory

---

Process Clause of the Fourteenth Amendment. *See Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000). However, the Court's due process analysis under the Fifth Amendment in *Bell* nevertheless controls that inquiry. *See, e.g., Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 991-92 (3d Cir. 1983).

15

restraints that may."[14]  *Id*. (citations omitted).

In order to determine whether the challenged conditions of pre-trial confinement amount to punishment,

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on whether [it has] an alternative purpose . . .  and whether it appears excessive in relation to [that] purpose . . . .  Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not

---

[14]For example, in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), the Court examined the automatic forfeiture-of-citizenship provisions of the immigration laws to determine whether that sanction was punishment or a regulatory restraint. It held that because forfeiture of citizenship traditionally had been regarded as punishment and because the legislative history of the provisions conclusively showed that forfeiture was intended to be punitive, automatic forfeiture was punishment that could not constitutionally be imposed without due process of law. *Id*. at 167-170.

16

> reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538-39 (citations, brackets and internal quotations omitted). However, the Court did not "detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention[.]" In *Bell*, the Court reasoned that it need only

> recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial confinement and dispel any inference that such restrictions are intended as punishment.

*Id.* at 540. In determining whether conditions or restrictions are

> reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should

17

ordinarily defer to their expert judgment in such matters.

*Id.* at 540 n.23 (citations and internal quotations omitted).

The Court held that double-bunking under the circumstances there did not constitute punishment. Accordingly, it did not violate the pre-trial detainees' due process rights. *Id.* at 541-543. More precisely, the Court found no due process violation where pre-trial detainees who were detained for generally less than sixty days were housed in 75 square feet of space containing a double bunk for six to seven hours a day, primarily for sleeping purposes. However, the Court offered a significant caveat. It cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Id.* at 542. It did not, however, elaborate upon the duration of confinement that could constitute "an extended period of time," nor did it elaborate upon the kind of "privations and hardship" that could constitute punishment in violation of the Due Process Clause.

Those issues were, however, present four years later when we decided *Union County Jail Inmates v. DiBuono*, 713 F.3d 984 (3d Cir. 1983). There, pre-trial detainees alleged that admittedly serious overcrowding in the county jail resulted in conditions of confinement that constituted punishment in violation of the Due Process Clause of the Fourteenth

18

Amendment.[15]  After discussing *Bell v. Wolfish* at some length, we distilled its teachings into the following two-step test:

> we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes.  In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions "cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them.

713 F.3d at 992 (citing *Bell*, 441 U.S. at 542) (internal quotation marks omitted).   Our inquiry into whether given conditions constitute "punishment" must therefore consider the totality of circumstances within an institution.  *Id.* at 996; *see also Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir. 1981) ("In determining whether conditions of confinement are unconstitutional under . . . the fourteenth amendment, we do not assay separately each of the institutional practices, but look to the totality of the conditions."), *overruled in part on other grounds, Int'l Woodworkers of America, AFL-CIO v. Champion*

---

[15]In *Union County*, sentenced inmates also challenged the conditions of their confinement.  However, the discussion of sentenced inmates' claims is not relevant here because those claims were analyzed under the Eighth Amendment.  713 F.2d at 997.

19

*Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) (*en banc*).

### B. Effect of *Union County Jail Inmates v. DiBuono* on the Plaintiffs' Condition of Confinement Claim.

Plaintiffs argue that *Union County Jail Inmates* controls our analysis and requires that we conclude that requiring pre-trial detainees to sleep on floor mattresses constitutes a due process violation. The district court rejected that argument based upon its conclusion that the relevant discussion there was *dictum*. 2003 WL 1697537 at *4. Plaintiffs' strongly disagree and forcefully argue that our inquiry is controlled by the precedent of *Union County*. The defendants just as forcefully disagree. Since *Union County* could potentially determine the outcome here, we will examine that decision in some detail.

As noted earlier, in *Union County*, pre-trial detainees brought a class action under § 1983 against various county officials alleging that certain of the conditions of their confinement violated the Due Process Clause of the Fourteenth Amendment. The county admitted that pre-trial detainees were being held in the overcrowded conditions specified in the complaint. However, the county filed a third party complaint against the Commissioner of the Department of Corrections alleging that the overcrowding resulted from the Commissioner's refusal to house prisoners who had been sentenced to state prison, as required by statute. According to the county, that refusal caused the overcrowding by requiring the county to house inmates who would otherwise have been housed in state facilities

20

Thereafter, the Governor issued an executive order declaring that overcrowding in state prisons and county jails constituted a state of emergency. The Governor's order also suspended operation of the statute requiring him to accept county prisoners who had been sentenced to state prison. Instead, it gave the Commissioner the authority to designate the place of confinement for both county and state inmates whether they were pre-trial detainees or convicted prisoners. Union County Jail was designated as the place of confinement for state prisoners sentenced in Union County because the Commissioner had determined that certain modifications would allow it to exceed its rated capacity of inmates.

In time, the county inmates entered into a consent decree with the county specifying that prison capacity would not exceed one inmate per cell.[16] The district court approved the agreement and entered a consent decree based upon it even though the Commissioner of Corrections was not a party to it. Nevertheless, the court directed the Commissioner to show cause why he should not be compelled to accept custody of all state prisoners in the county jail, and the court subsequently appointed a Special Master to investigate jail conditions and monitor compliance with the consent decree.

---

[16] The agreement also established a procedure whereby the county could request an immediate hearing before the district court if the jail population approached or reached the maximum capacity of 238. The court could then order the release or transfer of enough inmates to reduce the population to below the specified maximum.

Thereafter, the Special Master found six specific violations that he believed constituted violations of the pre-trial detainees' constitutional rights. These included: (1) housing several inmates in detention cells for more than a few days without adequate sleeping arrangements; (2) requiring detainees to sleep on floor mattresses adjacent to toilets, for more than a few days; (3) requiring detainees to sleep on floor mattresses in other parts of the jail, for more than a few days; (4) requiring detainees to wear the same clothing for several weeks, [in violation of a state statute]; (5) failing to screen for communicable diseases; and (6) depriving detainees of any meaningful opportunity for recreation.

The Master concluded that overcrowding resulted from housing two inmates in cells designed for one, and requiring the second inmate to sleep on "mattresses placed on the floors of these 5' x 7' cells next to the toilet." 713 F.2d at 988. The Commissioner objected to the Master's report. The Commissioner claimed that since housing more than one inmate in a cell had not been declared unconstitutional, the overcrowding could be solved by using bunk beds instead of floor mattresses. According to the Commissioner, this would satisfy the mandate of *Bell v. Wolfish*.

The district court adopted the Special Master's findings without modification. The court held "that the totality of the circumstances resulting from overcrowding at the Jail, and most notably forcing pre-trial detainees to sleep on mattresses placed on the floor, constituted a violation of the detainees' due process rights." 713 F.2d at 989. The district court rejected the Commissioner's suggestion for bunk beds. The court reasoned

22

that, given space limitations, double-celling amounted to punishment in violation of the pretrial detainees' due process rights. Since bunk beds would only perpetuate housing two inmates in cells designed for one, the district court invalidated the governor's executive order. The court also voided the Commissioner's designation of Union County jail as the place of confinement for state prisoners sentenced in Union County. Accordingly, the Commissioner had to transfer all state prisoners to state prisons.

On appeal, the Commissioner objected to the following provisions of the consent decree: ¶ (f) (establishing a maximum capacity at the jail [at] one inmate per general population cell); ¶ (g) (giving the defendants until July 1, 1982 to reduce the inmate population to 238); and ¶ (h) (authorizing the county to notify the department of corrections to remove any state prisoners who remained at the county jail beyond the statutorily allowed period of time).[17] The gist of the Commissioner's objection to the consent decree was that state law gave him the authority to determine inmate population levels in the Union County Jail.

In reviewing the district court's decision, we noted that the district court's conclusion that the jail overcrowding was rationally connected to the objective of detaining inmates who

---

[17] *See* 713 F.2d at 990 n.8, ("[o]ther than the provisions of (f), (g) and (h) noted herein, we do not understand the Commissioner to object to any provision of the consent judgment.").

23

could not make bail. The fact that the policy served both state and county governmental interests was not contested on appeal. 713 F.2d at 993. Therefore, "[t]he only question . . . remaining [under *Bell* was] whether the conditions and restrictions resulting from inmate overcrowding [could] be considered excessive in relation to the purposes assigned to them." *Id.* In conducting that analysis, we noted that two conclusions emerged from the proceedings in the district court:

> First, from the positions taken by the County and the Commissioner, we do not understand either of them seriously to contest the unconstitutionality, in the context of overcrowded conditions, of forcing pre-trial detainees to sleep for more than a few days on mattresses placed on the floor of a 5' x 7' cell adjacent to an open toilet which both cellmates must use. Indeed, the County conceded, at oral argument . . . that conditions as found by [the Special Master] were unconstitutional. Thus, the district court's implicit holding that conditions as found by the Special Master are "excessive in relation to the purposes assigned to them," is not questioned on this appeal.

> Our second conclusion is that, of all the various conditions challenged as being unconstitutional, *the most significant, and indeed the only condition not meeting constitutional standards, was the practice of placing a mattress on the floor for the second occupant of a cell designed*

24

> *for but one inmate*. It is not surprising, therefore,
> that the Commissioner focused on an alleviation
> of this latter condition by recommending double-
> bunking in such cells. The Commissioner
> contended that if, by providing double bunks, . .
> . constitutional objections to overcrowding could
> be overcome, then the Commissioner's discretion
> in determining where state prisoners should be
> placed, should not be overridden. We therefore
> turn to a consideration of the two-in-a-cell or
> double-bunking practice.

*Id.* at 994 (emphasis added).

The district court had concluded that double-bunking of pre-trial detainees was a constitutional violation because it imposed hardships tantamount to punishment. Accordingly, the court had ruled that practice an unconstitutional denial of the detainees' right to due process. However, we rejected the district court's spatial analysis and found that the Commissioner's recommended double-bunking would not only alleviate the problem resulting from floor mattresses, but would also free recreational space where detainees had previously had to sleep. We acknowledged that, even with double-bunking, the cells at issue would remain "cramped and overcrowded" and "very far from ideal[.]" However, we also noted that pre-trial detainees would have adequate room for sleeping and recreation. *Id.* at 996. We therefore "reject[ed] the district court's holding of unconstitutional conditions based solely on considerations of space." *Id.* at 996 (citation and internal quotations omitted). We explained:

25

> First, *and most importantly, providing double bunks will avoid the unsanitary and humiliating practice of forcing detainees to sleep on mattresses placed either on the floor adjacent to the toilet and at the feet of their cellmates*, or elsewhere in the Jail. Second, double-bunking will avoid the practice of having more than two detainees without adequate sleeping arrangements in the detention cells. Third, double-bunking will make it possible for recreational areas at the Jail to be cleared and dedicated to their original function. Thus, the remedial scheme put forth by the Commissioner, combining double-bunking with discharge of the County's obligations under the consent judgment, would effectively cure all of the conditions that were of particular concern to the Special Master. . . .
>
> Thus, although the question is not without difficulty, we are satisfied that, if the Commissioner's proposals. . . were fully implemented, conditions at the Jail would pass constitutional muster.

*Id*. at 996 (emphasis added). We also noted that pre-trial detainees were confined at the jail "for generally a maximum period of 60 days." *Id.* at 997 (citation omitted). We held that the district court had abused its discretion in rejecting the Commissioner's proposed remedies and ordered the district court to vacate portions of the consent decree that had rejected the Commissioner's proposed remedy. *Id*. at 1003. We

26

therefore concluded that the Commissioner's plan would alleviate the constitutional violations.

Plaintiffs' condition of confinement claim here is largely based upon the following language in *Union City*: "[O]f all the various conditions challenged as being unconstitutional, the most significant, and indeed the only condition not meeting constitutional standards, was the practice of placing a mattress on the floor for the second occupant of a cell designed for but one inmate. 713 F.2d at 994.[18] However, the district court here properly recognized that statement was dictum because the Commissioner (the appellant in *Union County*) had conceded the unconstitutionality of the practice. In *Union County*, we specifically noted that "[t]he State does not assert that it is proper for the County to require inmates to sleep on mattresses on the floor . . . . So the Special Master properly recommended that the floor mattresses practice should be eliminated." *Id*. at 994. Thus, we did not have to consider the constitutionality of the practice because both parties agreed that it was unconstitutional. Accordingly, the issue of the constitutionality of placing floor mattresses adjacent to a toilet was simply not before us and we did not decide it. Therefore, it was dictum. *See Cerro Metal Products v. Marshall*, 620 F.2d 964, 978 (3d Cir. 1980) (statements pertaining to issues not decided are dictum

---

[18]The plaintiffs then note that the "various conditions" we were referring to were the six overcrowding conditions that we have set forth above. *Id*. at 993-94 n.11.

27

because "the precise issue [is not] before the court.").[19]

Therefore, the district court here did not err in concluding that it was not bound by our holding in *Union City.* That does not, however, end our inquiry because the district court did not then proceed to conduct a proper analysis of these plaintiffs' due process claim given their status of pre-trial detainees.

---

[19] The nature of this statement in *Union County* became even more evident three years after *Union County* when we decided *Anela v. City of Wildwood*, 790 F.2d 1063 (3d Cir. 1986). There, we referred to this portion of our opinion in *Union County* as a "comment[]" rather than a "holding." *Id.* at 1069 (citation omitted). Although that reference does not, by itself, conclusively establish that our "comment" was dictum, it is certainly consistent with our conclusion that it was dictum. We also note that one judge in responding to the municipality's petition for rehearing in *Anela*, referred to this language in *Union County* as dictum.

The judge wrote: "while *Union County* did state *in dictum* that requiring detainees to sleep on mattresses on cell floors could constitute unconstitutional punishment under the fourteenth amendment, its observations were expressly limited to the situation in which detainees were subjected to such conditions 'for more than a few days.'" *Anela v. City of Wildwood*, 793 F.2d 514, 515 (3d Cir. 1986) (emphasis added).

**C. The district court's analysis of the conditions of confinement claim.**

In resolving the plaintiffs' conditions of confinement claim, the district court wrote: "In order to prevail on their claim that they are being punished, [the pre-trial detainees] must show that sleeping on mattresses on the floor deprived them of the 'minimal civilized measures of life's necessities.'" 2003 WL 1697537 at *5 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The court then explained that, in reviewing the claim, it must examine the "totality of the circumstances . . . in order to discover whether the overall conditions at Gander Hill deprived [the pre-trial detainees] of 'an identifiable human need, such as food, warmth, or exercise.'" *Id*. (quoting *Dickinson v. Taylor*, 2000 WL 1728363 (D. Del. May 19, 2000). The court cited *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991)).[20] The court then rejected plaintiffs' claim relying upon its own prior decisions. It reasoned:

> Under an Eighth Amendment analysis, this court has previously held that having to sleep on a mattress on the floor does not rise to the level of a constitutional violation. For example, in

---

[20] *Wilson v. Seiter* did not address pre-trial detainee's due process rights. Indeed, the Court in *Seiter*, could not logically determine whether a condition of confinement constitutes punishment by applying a test that assumes the propriety of punishment but prohibits punishment only when it becomes cruel and unusual.

29

[another case], the court held that in light of the prison overcrowding problem and the need for prison authorities to take interim measures to house inmates within a limited space, the fact that an inmate had to sleep on the floor in crowded or dirty conditions is insufficient to state a claim under Section 1983.

2003 WL 1687537 at *5 (citations and internal quotations omitted). The district court observed that "sleeping on the floor is not ideal," as we did in *Union County*. However, the court reasoned that, since "prison overcrowding in now a fact of life," sleeping on the floor "is not a violation of the Eight Amendment" "[a]s long as plaintiff is receiving adequate food, shelter, and clothing[.]" *Id.* at *5 n.2. The district court then reasoned that, since there was no constitutional violation, "the issue of whether [the prison officials] acted with deliberate indifference need not be reached." *Id*. at *6.

Given our discussion of *Bell v. Wolfish*, *supra*, it is clear that the district court's analysis of the pre-trial detainees' claim is fatally flawed. The Eighth Amendment "was designed to protect those convicted of crimes and consequently the Clause applies only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (citation and internal quotations omitted). Thus, the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until

30

"after sentence and conviction."[21] *Graham v. Connor*, 490 U.S. 392 n.6 (1989).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court set forth the standard for alleged violations of the Eighth Amendment while addressing non-medical conditions of confinement. The Court held that the prisoner must prove that prison officials acted with deliberate indifference that deprived him/her of "'the minimal civilized measure of life's necessities.'" *Id*. at 298-99, 301-05 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Here, the district court correctly cited the standard that governs plaintiffs' claims as follows:

> The U.S. Supreme Court set the standard for determining whether a condition of confinement of pretrial detainees violated their constitutional rights in *Bell v. Wolfish*. Whether there is a constitutional violation turns on whether the disability is imposed for the purpose of punishment or wether it is but an incident of some other legitimate governmental purpose. The government may detain an individual; the necessary inquiry is whether the conditions and restrictions of the detention amount to

---

[21]The Cruel and Unusual Punishments Clause, and indeed the entire Eighth Amendment, is made applicable to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962).

31

punishment.

2003 WL at *3 (citation omitted, emphasis added). However, the court then relied upon our decision in *Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993) in concluding that, "[n]evertheless, in *Bell v. Wolfish* and later cases, it is clear that when a court is considering general, non-medical conditions of confinement, the standard is the same for both pretrial detainees and sentenced inmates." *Hubbard v. Taylor*, 2003 WL 1697537, *3 (D. Del. 2003). More specifically, the district court cited our statement that "Pretrial detainees . . . are entitled to *at least* as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts." *Kost*, 1 F.3d at 188 n. 10. (emphasis added).

In *Kost,* we relied upon *Wilson v. Seiter* to conclude that "the standard for violations of the Eighth Amendment based on nonmedical conditions of confinement . . . would also apply to appellants as pretrial detainees through the . . . Due Process Clause." *Kost*, 1 F.3d at 188. Our analysis then became somewhat misleading as we proceeded to adopt a "deliberate indifference" inquiry to conclude that "[p]laintiffs have therefore stated a claim sufficient to withstand dismissal under the *Seiter* standard. . . ." *Id.*

The district court was clearly mislead by our *Kost* analysis. The court concluded that *Kost* was consistent with its own prior holdings in similar cases where the district court had applied an Eighth Amendment analysis to conditions of confinement claims of pre-trial detainees. The court reasoned: "[t]his court likewise has found that pre-trial detainees are

32

afforded essentially the same protection as convicted prisoners and that the Eighth Amendment analysis is appropriate for determining if the conditions of confinement rise to the level of a constitutional violation." 2003 WL at * 3 (citing *Ellegood v. Taylor*, No. 01-213 , 2002 WL 449758 (D. Del March 18, 2002).

The court also relied upon *City of Revere v. Mass. Gen. Hosp.*, 436 U.S. 239 (1983), stating: "Case law has established, however, that pretrial detainees are afforded essentially the same level of protection under the Fourteenth Amendment; therefore, an Eighth Amendment analysis is still appropriate." 2003 WL at *3, n.1. However, that is an overstatement of the holding in *City of Revere*. There, the Court stated that "[t]he Eighth Amendment's proscriptions of cruel and unusual punishments is violated by 'deliberate indifference to serious medical needs of prisoners.'" 463 U.S. 239, 244. The issue there involved a municipality's liability for medical costs of treating a suspect police had wounded as he was attempting to flee. The Court reiterated that "Eighth Amendment scrutiny is appropriate only after . . . [conviction]." *Id.* It therefore viewed the Eighth Amendment as relevant to conditions of pre-trial detainees only because it established a floor. The Court explained: "the due process rights of a [pre-trial detainee] are *at least* as great as the Eighth Amendment protections available to a convicted prisoner." *Id*. (citing *Bell v. Wolfish*).

Thus, although the district court correctly stated the appropriate test here, it overlooked the context and limitations of the relevant statements in *City of Revere* and *Kost.* The district court then erred in concluding that "pretrial detainees are

33

afforded essentially the same protection as convicted prisoners and that an Eighth Amendment analysis is appropriate for determining if the conditions of confinement rise to the level of a constitutional violation."

The district court's error is understandable given our discussion in *Kost*. There, we were discussing medical and nonmedical conditions of confinement. Although we specifically stated that the Eighth Amendment provided a floor for our due process inquiry into the medical and nonmedical issues, much of our discussion focused on whether the plaintiffs had established the "deliberate indifference" that is the hallmark of cruel and unusual punishment under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). Moreover, we failed to cite *Bell v. Wolfish* which, as we have explained, distinguishes between pretrial detainees' protection from "punishment" under the Fourteenth Amendment, and convicted inmates' protection from punishment that is "cruel and unusual" under the Eighth Amendment.[22]

---

[22] Even before *Kost*, we had analyzed a pre-trial detainee's claim of inadequate medical treatment under the Eighth Amendment standards articulated in *Estelle v. Gamble*. For example, in *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), we held that "at a minimum, the 'deliberate indifference' standard of *Estelle v. Gamble*, must be met" at an institution housing pre-trial detainees, and in *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987), we noted that even though the constitutional protections afforded prisoners and pre-trial detainees against inadequate medical care arise

Nevertheless, it is clear that plaintiffs here "are not within the ambit of the Eighth Amendment['s]," prohibition against cruel and unusual *punishment. Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987). They are not yet at a stage of the criminal process where they can be punished because they

_____

from different textual sources, the standards governing the provision of medical care to each class are similar. We have continued this practice after *Kost. See, e.g., Natale v. Camden County Correctional Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003) ("In previous cases, we have found no reason to apply a different standard than that set forth in *Estelle . . .* We therefore evaluate Natales' Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment.").

The analysis is further confused because *Kost* suggests a separate and distinct analysis governs nonmedical and medical claims under the Eighth Amendment. However, in *Seiter*, the Court stated:

> Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medicalneeds, or a combination of both, it is appropriate to apply the deliberate indifference standard articulated in *Estelle.*

501 U.S. at 304 (brackets in original) (internal quotation marks omitted).

35

have not as yet been convicted of anything. As the Supreme Court explained in *Bell*, pre-trial detainees cannot be punished at all under the Due Process Clause.

As we have already explained, *Bell v. Wolfish* established that standard. The district court therefore relied upon seemingly applicable language in *Kost* without considering its context, or the controlling authority of *Bell v. Wolfish*.[23] Accordingly, we must reverse the district court's

---

[23]In *Kost*, we evaluated claims by pretrial detainees that the conditions of their confinement were unconstitutional. Although we focused on whether the plaintiffs had established the "deliberate indifference" that characterizes cruel and unusual punishment in violation of the Eighth Amendment*, see Estelle v. Gamble*, 429 U.S. 97 (1976), we specifically distinguished between the protections of the Due Process Clause and those of the Eighth Amendment. *Kost*, 1 F.3d at 188 ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause.") (quoting *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (1987)). Moreover, we recognized that pretrial detainees are entitled to greater constitutional protection than that provided by the Eighth Amendment. *Id.* at 188 n.10. Although we did not specifically cite *Bell v. Wollfish*, our analysis in *Kost* is consistent with *Bell*'s distinction between pretrial detainees' protection from "punishment" under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is "cruel and unusual" under the Eighth Amendment, on the other.

grant of summary judgment to the prison officials on the pre-trial detainees' conditions of confinement claim and remand for a proper analysis of that claim under the standard announced in *Bell v. Wolfish.*[24]

---

[24] The prison officials claim that this action is barred by the Prisoner Litigation Reform Act ("PLRA"). That Act provides in part:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). However, the plaintiffs do allege physical injury. Accordingly, there is a factual dispute for the district court to resolve on remand.

Moreover, § 1997e(e) does not bar all such claims absent physical injury as claims for declaratory relief as well as nominal and punitive damages for violations of constitutional rights are not barred by § 1997e(e). *See Doe v. Delie*, 257 F.3d 309, 314 n.13 (3d Cir. 2001) ("However, § 1997e(e) does not bar claims seeking nominal damages to vindicate constitutional rights, nor claims seeking punitive damages."); *Allah v. Al-Hafeez*, 226 F.3d 247, 251-52 (3d Cir. 2000) (Holding that § 1997e(e) does not bar nominal and punitive damages for

37

In their motion for summary judgment, the prison officials also argued that they were entitled to qualified immunity from the conditions of confinement claim. *Abdul-Akbar v. Watson*, 4 F.3d 195, 210-02 (3d Cir. 1993). The prison officials argued they acted reasonably and are therefore immune from suit because every district court judge in the District of Delaware has ruled that having pre-trial detainees sleep on mattresses on the floor at Gander Hill is constitutionally permissible.[25] The district court addressed the merits of the plaintiffs' claim without reaching defendants' entitlement to qualified immunity.

If, on remand, the prison officials again assert qualified immunity, we remind the district court that the immunity claim must be resolved first. Since qualified immunity is "an *immunity from suit*, rather than a mere defense to liability, it is imperative to resolv[e] immunity questions at the earliest

---

violations of constitutional rights even in the absence of physical injury).

[25]The prison officials cite to the following cases: *Renn v. Taylor*, 2001 WL 657591 (D.Del. March 2, 2001) (Robinson, J.); *Bagwell v. Brewington-Carr*, 2000 WL 1728148 (D.Del. April 27, 2000) (Sleet, J.); *Jackson v. Brewington-Carr*, 1999 WL 27124 (D.Del. Jan. 14, 1999) (Farnan, J.); *Bartley v. Taylor*, Civ. A. No. 98-503 (D.Del. Sept. 10, 1999) (McKelvie, J.); *Torres v. Brewington-Carr*, Civ. A. No. 98-159 (D.Del. Nov. 29, 1999) (Longobardi, J.).

possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (citations omitted) (emphasis in original).

## D. The ADA claim.

The district court also failed to address Ketchum's ADA claim. Rather, the court simply granted summary judgment to the prison officials on that claim with no analysis. The district court's failure to explain why it granted summary judgment to the prison officials on the ADA claim is contrary to the requirements set forth in *Valdino v. A. Valey Engineers*, 903 F.2d 253, 259 (3d Cir. 1990). There, we explained that "we will exercise our supervisory power to require the district courts in this circuit to accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." We will also remand the ADA claim to the district court for compliance with the directive of *Valdino*.[26]

## E. Class certification.

Although the district court did not explain why it denied the motion for class certification "as moot," 2003 WL 1697537 at *6, we assume that the motion was denied because the court dismissed the underlying conditions of confinement claim and

---

[26]The prison officials claim that Ketchum is no longer incarcerated at Gander Hill. If that is true, we assume that the prison officials will properly inform the district court on remand.

39

therefore saw no need to entertain the motion for class certification. Since we are reversing the grant of summary judgment and remanding for analysis under *Bell v. Wolfish*, we will also reverse the district court's denial of the class certification motion. The district court can address that motion as it deems appropriate if the motion is renewed on remand.

## IV. CONCLUSION

For the above reasons, we will vacate the grant of summary judgment to the defendants and remand the conditions of confinement claim for consideration under *Bell v. Wolfish*.[27] We will also remand the ADA claim and, the denial of the class certification motion for compliance with *Valdino v. A. Valey Engineers*.

---

[27]The defendants claim that no named plaintiff is still housed at Gander Hill as a pre-trial detainee. Therefore, they contend that any request for injunctive relief is moot. However, even if no named plaintiff remains at Gander Hill as a pre-trial detainee, because of the "temporary nature of confinement" at Gander Hill, "the issues presented are . . . 'capable of repetition, yet evading review.'" *Bell*, 441 U.S. at 527 n.5 (citations omitted). Therefore, we do not believe that the request for injunctive relief is moot.