UNITED STATES of America ex rel.
David TYRRELL

v.

Fred SPEAKER, former Atty. General
of Pa., et al.

Nos. 75–1668, 75–1669.

United States Court of Appeals,
Third Circuit.

Argued Feb. 5, 1976.

Decided May 7, 1976.

As Amended June 21, 1976.

Robert P. Kane, Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Michael Minkin, Deputy Atty. Gen., Com. of Pa., Philadelphia, Pa., for appellant in No. 75–1668.

Mark M. Wilcox, Ralph S. Spritzer, Thomas W. Meiklejohn and Thomas D. Panebianco, Indigent Prisoner Litigation Program, Philadelphia, Pa., for appellee in No. 75–1668 and cross-appellant in No. 75–1669.

Before SEITZ, Chief Judge, and VAN DUSEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The Warden of the State Correctional Institution at Graterford (Warden)[1] appeals from a judgment of $500.00 in favor of Tyrrell, an untried prisoner, who also appeals. While awaiting trial, the prisoner was confined in the above penal institution in administrative segregation from February 10, 1970, until October 20, 1970. We affirm, but direct a reduction of the nominal damages awarded.

The action is based on 42 U.S.C. § 1983.[2] and the early procedural history of this case is set forth in Judge Biggs' opinion in *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197 (3d Cir. 1973), where we remanded the case for further consideration on a more adequate record.

On January 20, 1970, Tyrrell was lawfully incarcerated in the Delaware County prison awaiting trial on a series of charges, including robbery and the shooting of a police officer (38a). On that date, the plaintiff was seen by William E. Rambo and Samuel LaSpena, two guards at the Delaware County prison, leaving the cell assigned to Raymond Crispt. Rambo and LaSpena observed the plaintiff covered with dust and white powder (38a). Upon investigation, the guards discovered a hole in Crispt's cell, and reported the incident to the Warden (39a).

On January 28, 1970, Warden John I. Gable, of the Delaware County prison, swore to a criminal complaint charging that the plaintiff had attempted to break prison and escape (39a, 305a–06a). On that same day, the criminal complaint, charging the plaintiff with attempting to break prison and escape, and an arrest warrant were issued by Clarence B. Nesbitt, Jr., Justice of the Peace (39a, 205a, 207a).

The following day, January 29, 1970, plaintiff was given a preliminary arraignment on the charge of attempting to break prison and escape (39a). On February 3, 1970, plaintiff was given a preliminary hearing before Justice of the Peace Clar-

---

1. The case against all defendants other than Alfred T. Rundle, former Superintendent of the State Correctional Institution at Graterford, has been dismissed by the district court, and such action is not challenged by this appeal.

2. The district court had jurisdiction of this case under 28 U.S.C. § 1343(3). The district court opinion is reported as *Tyrrell v. Taylor,* 394 F.Supp. 9 (E.D.Pa.1975).

ence B. Nesbitt, Jr. on the above charges (39a). At this hearing on February 3, 1970, the plaintiff was represented by counsel, and had the opportunity to cross-examine the witnesses who testified against him. Among those witnesses who testified against the plaintiff were Guards Monyar, Joines, Samuel LaSpena, and Warden John I. Gable (129a, 209a). A prima facie case of attempting to break prison and escape was established against Tyrrell and he was held, without bail, for action by the Delaware County Grand Jury (129a, 209a).

On Friday, February 10, 1970, the plaintiff was transferred to the State Correctional Institution at Graterford and placed in administrative segregation (39a). At that time, he was an untried prisoner. On Monday, February 13, 1970, the plaintiff was interviewed by the Behavior Clinic at the State Correctional Institution at Graterford (40a). During the course of that interview, the plaintiff was advised that he was being retained in administrative segregation because of his status as an alleged security risk (40a, 212a). The plaintiff was advised that the prison officials were aware of the charges being brought against him by the Delaware County officials and asked the plaintiff to make a statement. Plaintiff denied that he was attempting to break prison and escape, and reiterated his previous story that he had gone into Raymond Crispt's cell in order to get a cigarette (195–96a, 198a).

The Behavior Clinic recommended, and Rundle approved, plaintiff's retention in administrative segregation at the State Correctional Institution at Graterford (72a, 212a). This decision was based on the facts adduced at the hearing of February 13, 1970 (195–98a, 212a). During the period of plaintiff's confinement in administrative segregation at the State Correctional Institution at Graterford, he spent a total of 70 days at the Delaware County prison, where he was transferred incident to court hearings.

The plaintiff was interviewed on three other occasions by the staff at the State Correctional Institution at Graterford after his initial interview of February 13, 1970. On August 13, 1970, and September 10, 1970, the plaintiff was given the opportunity to speak, but on both occasions declined such opportunity and refused to say anything (193–98a, 40a). On October 20, 1970, the plaintiff was again interviewed and released into the general population at the State Correctional Institution at Graterford, and assigned to Cell Block "C," with employment as a cleaner (40a). This release was apparently due to his status as a convicted prisoner following his conviction on October 9, 1970, of the charges of robbery and the shooting of a policeman. On February 9, 1971, plaintiff was acquitted of the charge of attempted escape (40a).

Initially we turn to the issues raised in the appeal of defendant Rundle.

I. FINDING THAT PLAINTIFF WAS PLACED AND RETAINED IN ADMINISTRATIVE SEGREGATION UNTIL OCTOBER 20, 1970, SOLELY BECAUSE OF HIS STATUS AS AN UNTRIED, UNCONVICTED[3] PRISONER.

Defendant Rundle challenges this Finding 10 as clearly erroneous (see F.R. Civ.P. 52):

"Plaintiff was placed in 'B–Block Gallery, Administrative Segregation' because he was a pretrial detainee or untried prisoner and not because he was determined to be a security risk at Graterford."

However, we reject this contention in view of these items of the record:

A. Paragraph 2 of the Fourth Affirmative Defense in defendant's answer states, *inter alia:*

" . . . the defendants aver that the plaintiff was placed in administrative segregation because of his status as an untried and unconvicted prisoner." (41a)

---

**3.** Plaintiff was convicted of robbery and the shooting of a policeman on or about October 9, 1970 (Finding 8 at 53a).

B. Paragraph 1 of FURTHER STIP-ULATIONS OF FACT (71a) recites:

"1. As of February 10, 1970, the policy of Superintendent Rundle of the State Correctional Institution at Graterford was to place pretrial detainees in administrative segregation."

C. In answers to interrogatories 5 and 10(a) filed April 24, 1973 (Document 16 in Civil No. 71–939, E.D.Pa.), the defendant stated:

"5. Plaintiff was placed in administrative segregation because he was an untried prisoner.

.        .        .        .        .

"10(a) Plaintiff remained in administrative segregation [until October 20, 1970] because of his status as an untried prisoner."

D. Plaintiff was released into the general prison population on October 20, 1970, after conviction for the charges on which he was arrested but prior to his February 1971 acquittal of the attempted prison break charge (15 at 40a).

The district court was justified in concluding that the release described under D above prior to disposition of the prison breach charge was inconsistent with defendant's contention that plaintiff was placed and retained in administrative segregation because he was a security risk.

The defense contends that, despite the uncontradicted admissions in the interrogatories and stipulations, the district court should have found that although plaintiff's original placement in administrative segregation was because of a policy to place untried prisoners in such segregated status, his retention there was because he was a security risk. It is difficult to understand how the defense can assert such an argument on appeal when it chose not to offer any evidence from a Warden or Assistant Warden contrary to the admissions and stipulations referred to in A–C above. The record did not give the district court the alternative of making a factual finding on this issue different from the one challenged here.

## II. CONCLUSION THAT PLACEMENT OF PLAINTIFF IN ADMINISTRATIVE SEGREGATION IN A STATE PRISON VIOLATED HIS CONSTITUTIONAL RIGHTS.

The record supports the description in Finding 11 that the living conditions of prisoners in the administrative segregation on B-Gallery, where plaintiff was confined, were significantly more restricted than those of the general prison population.[4]

4. Finding No. 11, which is not clearly erroneous, reads as follows:

"11. Viewed as a whole, the living conditions of pretrial detainees in 'B-Block Gallery, Administrative Segregation,' to which plaintiff was subject while he was there, were significantly more restricted and inconvenient than the living conditions of the general prison population. Prisoners confined in B-Gallery had scantier bedding and clothing than prisoners in the general population. The temperature during the colder months in B-Gallery, although not excessively low, was lower than the temperature in other parts of the prison and living in B-Gallery was to that extent more uncomfortable. Unlike prisoners in the general population, plaintiff could not attend religious services although a priest could visit him in his cell. Unlike prisoners in the general population, while in administrative segregation plaintiff could not send registered or certified mail, and, although he could have documents notarized, they were not notarized in his presence. Unlike prisoners in the general population, plaintiff did not have access to legal materials. Unlike prisoners in the general population, plaintiff did not have general commissary privileges nor did he have access to the prison library, television, or movies. If he requested them prison officials would bring to his cell four randomly-selected books from the prison library. Medical care in administrative segregation was apparently more cursory than in other parts of the prison; plaintiff, for example, was unable to get filled a prescription for eyeglasses. While in administrative segregation, plaintiff was allowed only very short, daily exercise periods out of his cell in a small enclosure lacking any recreational facilities. Inmates in the general population could exercise much more frequently in a larger area equipped with sports and recreational facilities. Showers were available twice a week in administrative segregation as opposed to daily in the general prison area and materials offered to prisoners to clean their cells were fewer in administrative segregation than in the general prison areas. The heads of pretrial detainees on B-Gallery

■ We affirm the district court's holding that the state violated the due process clause of the Fourteenth Amendment in arbitrarily imposing materially greater restrictions on the freedom of this pre-trial detainee than those imposed on convicted prisoners at Graterford, since the only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial.[5] *Rhem v. Malcolm,* 507 F.2d 333 (2d Cir. 1974), *affirming* 371 F.Supp. 594 (S.D.N.Y.1974); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 688 (D.Mass.1973), *aff'd,* 494 F.2d 1196 (1st Cir. 1974). See also *Wolff v. McDonald,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935, 951–52 (1974); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Roe v. Wade,* 410 U.S. 113, 167–71, 93 S.Ct. 705, 733–36, 35 L.Ed.2d 147, 193–95 (1973) (Stewart, J., concurring); *Griswold v. Connecticut,* 381 U.S. 479, 502–07, 85 S.Ct. 1678, 1691–94, 14 L.Ed.2d 510, 525–28 (1965) (White, J., concurring).[6]

In *Rhem, supra,* the court said at page 336 of 507 F.2d:

"The demands . . . of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detain-

ees under worse conditions than convicted prisoners."

Numerous district court cases, including the following, have held that to impose additional restrictions on the liberty of a pretrial detainee solely because he had not been convicted is not justified by any state interest and denies him his Fourteenth Amendment rights: *Miller v. Carson,* 392 F.Supp. 515, 521 (M.D.Fla.1975); *Cudnik v. Krieger,* 392 F.Supp. 305, 310–12 (N.D.Ohio 1974); *Wilson v. Beame,* 380 F.Supp. 1232 (E.D.N.Y.1974); *Collins v. Schoonfield,* 344 F.Supp. 257 (D.Md.1972); *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Seale v. Manson,* 326 F.Supp. 1375 (D.Conn.1971); *Tyler v. Ciccone,* 299 F.Supp. 684 (W.D.Mo.1969).[7]

## III. IMMUNITY FROM LIABILITY OF DEFENDANT AND THE ALLEGED DEFENSE OF GOOD FAITH BY RUNDLE.

In *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103 (1974), the Court said:

" . . . [I]n varying scope, a qualified immunity is available to officers of the executive branch of the government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the

---

were shaved close. This was not done to prisoners in the general population. Finally, opportunity to work, attend school, or take vocational training, available to the general population, was denied to pretrial [detainees]." 394 F.Supp. at 15.

5. We recognize that the state had a legitimate interest in restricting plaintiff from escaping and aiding others to escape from its institutions. This interest justified the transfer of plaintiff from the less secure Delaware County jail, where the prison break and escape were allegedly attempted, but the defendant failed to show that the presence of plaintiff in the general population at the more secure and larger Graterford State Prison would have constituted a threat to the security, discipline, personnel or inmates and justified the plaintiff's administrative segregation at that institution.

6. Several other district courts have stated that pretrial detainees do not stand on the same footing as convicted inmates and they may only be subjected to restrictions and privations necessary for their confinement and the compelling needs of jail administration. See, for example, *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157 (E.D.Wis.1973); *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D. Cal.1972); *Smith v. Sampson,* 349 F.Supp. 268 (D.N.H.1972); *Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971). See also Note, Constitutional Limitations on the Conditions of Pre-Trial Detention, 79 Yale L.J. 941, 951–53 (1970).

7. In the above-cited cases, the Supreme Court has framed constitutional issues in terms of substantive due process, as noted by the district court (64a at note 31), and emphasized the right of a citizen to protection from unnecessary deprivation of his liberty by the state.

action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." [7a]

■ Although the immunity of certain officials is available in defense of a suit by a prisoner under 42 U.S.C. § 1983, this principle has not been applied by this court where, as here, the record is silent on the authority of the public official. See *Johnson v. Alldredge*, 488 F.2d 820, 825–27, including note 8 (3d Cir. 1973). In order to secure the benefit of immunity, Chief Judge Seitz made clear in *Johnson, supra* at page 825, that the defendant must show that his action in placing the untried defendant in administrative segregation with the consequences described in Finding 11 (see note 4 above) involved "an exercise of judgment" and was "within the outer perimeter of [his] authority." [8] In that case, the record contained affidavits describing the discretionary authority of the defendant but such evidence was not offered in the district court in this case.

■ Turning to the defense of good faith, this court has made clear that the

officials have "the burden of pleading and proving that they had a reasonable good faith belief that their actions were lawful." *Fidtler v. Rundle*, 497 F.2d 794, 801 (3d Cir. 1974). In *Scheuer v. Rhodes*, 416 U.S. 232, 249–50, 94 S.Ct. 1683, 1693, 40 L.Ed.2d 90, 104 (1974), the Court said:

> "In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor, . . . . There was no evidence before the courts from which such a finding of good faith could be properly made . . . ."

■ Defendant Rundle has offered no evidence that he did rely on a state statute, court order, or the general law in confining plaintiff in administrative segregation for approximately 175 days from February 10, 1970, to October 20, 1970, except for the approximately 70 days during this period that he was confined at the Delaware County prison while awaiting or attending court proceedings. See *Fidtler, supra* at 801–02 of 497 F.2d.[9]

After careful consideration, we reject defendant's contention that his good faith was established because "public officials are presumed to have acted lawfully and in

**7a.** In *Imbler v. Pachtman*, 424 U.S. 409, 419, 96 S.Ct. 984, 989, 47 L.Ed.2d 128, 137 n. 14 (Opinion of 3/2/76, 44 U.S.L.W. 4250, 4253 including note 14), this language from *Scheuer, supra,* was quoted with approval.

**8.** See also *Safeguard Mutual Insurance Co. v. Miller*, 472 F.2d 732, 733–34 (3d Cir. 1973); *Lasher v. Shafer*, 460 F.2d 343, 348 (3d Cir. 1972).

**9.** We reject the contention that, because plaintiff's continued confinement in the Delaware County prison would have resulted in more restrictions on his liberty than his living conditions in administrative segregation at Graterford, which conditions improved after his transfer (page 19 of defendant's brief), he has no cause for complaint. As pointed out by the Supreme Court in *Wolff v. McDonald, supra,* 418 U.S. at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 951:

> "Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good

behavior, . . . . But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."

The state-created conditions at Graterford for convicted felons were considerably less restrictive than those for prisoners in administrative segregation (see Finding 11 in note 4 above), and they could not be "arbitrarily abrogated" for an unconvicted prisoner assigned to Graterford without an affirmative showing that there was some threat to the security, discipline or persons at Graterford (see last sentence of note 5 above).

good faith until facts showing the contrary are averred or in a proper case averred and proved" (page 4 of reply brief).[10] As noted above, *Scheuer v. Rhodes, supra,* made clear that good faith could only be a defense for improper official action where there was evidence in the record from which a finding of good faith could be made. Under the record in this case, as pointed out under I above, the basis of defendant's action in placing plaintiff in administrative segregation is conclusively established by the answer, the stipulation, and admissions in the answers to interrogatories negativing any conclusion of lawful action by a public official even if such a presumption exists under certain circumstances.

For the foregoing reasons, we have determined that the district court did not err in concluding that defendant has not sustained his burden of proving that he is protected either by the immunity doctrine or a good faith belief that his action in placing plaintiff in administrative segregation, as disclosed in this record, was lawful.[11] In fact, as shown above at pages 825–826, the district court was justified in concluding that the record shows that plaintiff was placed in administrative segregation because he was an unconvicted prisoner.

## IV. THE AWARD OF DAMAGES.

After careful consideration, we have determined that plaintiff's appeal at No. 75–1669, claiming that he is entitled to damages based on "the nature of the deprivation and the emotional distress it may have induced," must be denied on the merits.

■ We have concluded that the district court was justified in determining that plaintiff was only entitled to nominal damages on this record. Plaintiff was not in fact prejudiced by his transfer from the Delaware County prison to administrative segregation at Graterford, since the conditions of his confinement in the County Prison were considerably more restrictive than those at Graterford.[12] Under these circumstances, the due process constitutional violation did not cause any damages that he would not have had even though he had not been transferred to Graterford and such violation had not occurred.

For the foregoing reasons, we affirm the decision of the district court to award only

10. The cases cited by defendant on this page are factually inapplicable to this record. For example, *Kephart v. Richardson,* 505 F.2d 1085 (3d Cir. 1974), involved the presumption of regularity of official records. The Pennsylvania Supreme Court has abrogated the principle of governmental immunity applied in *Robinson v. City of Philadelphia,* 400 Pa. 80, 161 A.2d 1 (1960). See *Ayala v. Phila. Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973).

11. We do not agree with defendant that *United States ex rel. Bracey v. Rundle,* 368 F.Supp. 1186 (E.D.Pa.1973), requires the conclusion that he must be granted a judgment of no liability on this record. We note that in 1969 Chief Judge Becker had stated in *Tyler v. Ciccone,* 299 F.Supp. 684, 688 (W.D.Mo.), that an unconvicted prisoner may only be subject to "justifiable" restrictions on his activities. In the *Tyler* case, *supra,* the court used this language at pages 687–88:

> "While the Constitution authorizes forfeiture of some rights of convicts, it does not authorize treatment of an unconvicted person . . . as a convict. . . . "

12. During the plaintiff's initial incarceration at the Delaware County prison, he was incarcerated in a cell block separate from the cell block where inmates of the general prison population were incarcerated (131a). He had no library privileges, nor did he have any medical treatment (132a & 134a). After the preliminary hearing of February 3, 1970, the plaintiff was locked in his cell for a period of 24 hours per day (135a–136a). This segregation resulted from the filing of charges of attempting to break prison and escape and the establishment of the prima facie case against him at the preliminary hearing (128a, 131a, 135a–136a). During this period of incarceration, February 4, 1970, until February 10, 1970, Tyrrell was not permitted to exercise, and took all of his meals in his cell (128a–136a). He was not permitted the opportunity to attend Chapel, nor was he permitted to talk with the other inmates (128a–136a). During plaintiff's entire confinement at Delaware County prison, he was not permitted to go to school nor participate in any of the programs established for the rehabilitation of prisoners at that prison (131a).

nominal damages on this record, but will amend the judgment to reduce the amount of such nominal damages from $500.00 to $1.00. We have concluded that, as a matter of law, nominal damages may not exceed one dollar on this record. In *Magnett v. Pelletier*, 488 F.2d 33, 35 (1st Cir. 1974), the court held that an award of $500.00 to plaintiff in a civil rights action could not properly be regarded as nominal damages and, if compensatory damages were not warranted, "the award shall be reduced to the sum of $1.00." [13]

For the reasons stated above,[14] we will (1) enter an order modifying the February 21, 1975, judgment (70a) by substituting "$1.00" for "$500.00," see 28 U.S.C. § 2106, and (2) in all other respects affirm that judgment.

We are grateful to the law students from the University of Pennsylvania Law School, appointed to represent plaintiff, for their thorough brief and oral argument.

---

13. On this record, we can find no reason to remand the case to the district court on the remote possibility that the trial judge meant "compensatory" when he said "nominal." Also, we note that in the absence of any federal precedent, a federal court may look to the law of Pennsylvania for the amount of the nominal damages payable by a Pennsylvania prison warden. In *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 197 A.2d 721, 728 (1964), the Supreme Court of Pennsylvania concluded:

"The basic unit of American money is the dollar, and, in the future, when nominal damages are awarded in our courts, one dollar shall be the measure thereof."

14. We have considered and rejected the remaining contentions of defendant. For example, we reject the contention that defendant was prejudiced through the late introduction of a new legal theory in the pre-trial order of April 25, 1974 (pp. 28–31 of defendant's brief) for the reasons stated at pages 25–26 of plaintiff's brief.