

Villanova University School of Law
Villanova University School of Law Digital Repository

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-5-2008

# Hubbard v. Taylor

Precedential or Non-Precedential: Precedential

Docket No. 06-4627

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Hubbard v. Taylor" (2008). *2008 Decisions.* Paper 602.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/602

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4627

———

GREGORY HUBBARD; ALVIN PHILLIPS;
JULIAN PAYNE; CURTIS GIBBS;
GREGORY J. BOLLING; LEONARD GARNER;
GREGORIO TOMAS; DESMOND BROWN;
THELLIE CHAMBLEE; SPUD M. BURNS, JR.;
ROBERT WARD; CHRISTOPHER VAVALA;
KRISTOFER JACKSON; TIMOTHY THOMAS;
PAUL C. WOODWARD; JOSEPH MICHAEL CREEGAN,
JR.; JAVARI WILLIAMS; FLOYD HUNT;
BRYANT CHARLES; CLAUDE JONES;
EDDIE A. CARTER; THEODORE JACKSON;
ANDRE MURRAY; ATIF MOHAMMAD;
PEDRO RIVERA, JR.; ANDREW P. BLAKE;
LINWOOD WILSON; WILLIAM T. DAVIS;
WILL T. GRAHAM; KEVIN M. AGNEW;
NOEL SANTIAGO; WALTER KRAUSE, III;
BARRY J. GREEN; WEDUS MADDOX;
RAYMOND STEVENS; JAMES A. WILSON;
MATTHEW MAJOR, JR.; PERCY OSBORNE;
KEVIN KETCHUM; SAMUEL TURNER POOLE,

*Appellants,*

v.

COMMISSIONER STANLEY TAYLOR;
WARDEN RAPHAEL WILLIAMS;
ATTORNEY GENERAL M. JANE BRADY

———

On Appeal from the United States District Court
for the District of Delaware

District Court No.: 00-cv-0531
District Judge:  Honorable Sue L. Robinson

———

Argued October 24, 2007
Before: SLOVITER, CHAGARES and HARDIMAN, *Circuit
Judges*.

(Filed: August 5, 2008)

Paul E.  Crawford (Argued)
Helena C.  Rychlicki
Connolly, Bove, Lodge & Hutz
1007 North Orange Street
P.  O.  Box 2207
Wilmington, DE 19899
　　*Attorneys for Appellants*

Richard W. Hubbard (Argued)
Department of Justice
820 North French Street
Carvel Office Building
Wilmington, DE 19801
    *Attorney for Appellees*

———

OPINION OF THE COURT

———


HARDIMAN, *Circuit Judge*.

This case comes to us for the second time. In *Hubbard v. Taylor,* 399 F.3d 150 (3d Cir. 2005) (*Hubbard I*), we held that when pretrial detainees challenge conditions of confinement, their claims must be analyzed under the Due Process Clause of the Fourteenth Amendment. Because the District Court initially evaluated Plaintiffs' claims under the Eighth Amendment's prohibition against cruel and unusual punishment, we vacated the order granting summary judgment to Defendants and remanded to the District Court for analysis under the Fourteenth Amendment. Furthermore, as the District Court had addressed the merits of Plaintiffs' claims without reaching Defendants' assertions of qualified immunity, we instructed the District Court to resolve the qualified immunity issue first. *Hubbard I*, 399 F.3d at 167.

3

On remand, the District Court found that Defendants were entitled to qualified immunity under either prong of the familiar two-step analysis established by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194 (2001). *See Hubbard v. Taylor*, 452 F. Supp. 2d 533 (D. Del. 2006). Plaintiffs filed this timely appeal and jurisdiction lies under 28 U.S.C. § 1291.[1]

## I.

Plaintiffs claim that they were punished in violation of the Due Process Clause of the Fourteenth Amendment when they were "triple-celled," or housed three-to-a-cell, in the West Wing of the Multi-Purpose Criminal Justice Facility in Wilmington, Delaware (commonly known as "Gander Hill"). The facts of this case are set forth in Judge McKee's comprehensive opinion for the Court in *Hubbard I.* We assume familiarity with those facts and will not restate them here.

Pursuant to the Supreme Court's decision in *Saucier*, we must first resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If there has been a violation, we proceed to the

_____

[1] Former Delaware Attorney General M. Jane Brady appears in the caption as a Defendant and was discussed as such in the opinion below. We note that Plaintiffs' Amended Complaint made no claims against her and failed to name her as a Defendant.

4

second step of *Saucier*, which asks "whether the right was clearly established."[2] *Id.*

## II.

In *Hubbard I*, we noted that when pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause of the Fourteenth Amendment. As the Supreme Court stated in *Bell v. Wolfish*:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty

---

[2] We note that since *Saucier* was decided, several justices have questioned the propriety of rigidly obliging district courts to consider the constitutional question first. *See Morse v. Frederick,* — U.S. —, 127 S. Ct. 2618, 2641 (2007) (Breyer, J., concurring in part and dissenting in part); *see also Brousseau v. Haugen*, 543 U.S. 194, 201-02 (2004) (Breyer, J., joined by Scalia and Ginsburg, JJ., concurring); *Bunting v. Mellen*, 541 U.S. 1019, 1019 (2004) (Stevens, J., joined by Ginsburg and Breyer, JJ., respecting denial of certiorari); *id.* at 1022-23 (Scalia, J., joined by Rehnquist, C.J., dissenting). On March 24, 2008, the Supreme Court granted certiorari in *Pearson v. Callahan,* 128 S. Ct. 1702, 2008 WL 754340 (U.S.), a case arising under the Fourth Amendment in which the Court directed the parties to brief and argue whether *Saucier* should be overruled.

without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

441 U.S. 520, 535 (1979).

Accordingly, we must determine whether the conditions imposed upon Plaintiffs at Gander Hill amount to punishment. In making this determination:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on 'whether [the disability has] an alternative purpose . . . and whether it appears excessive in relation to [that] purpose.' . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental

6

action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538-39 (citations omitted). The Supreme Court further stated that:

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 540 n.23 (citations omitted). *See also Block v. Rutherford*, 468 U.S. 576, 584 (1984) (emphasizing the "very limited role that courts should play in the administration of detention facilities").

In *Union County Jail Inmates v. Di Buono*, 713 F.2d 984 (3d Cir. 1983), this Court distilled the Supreme Court's teachings in *Bell* into a two-part test. "[W]e must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Id.* at 992.

7

A.

Before the District Court, Plaintiffs argued that they were triple-celled for the illegitimate purpose of coercing them to enter into plea bargains. Here, however, Plaintiffs rely on "[a]n elementary mathematical calculation" in challenging the legitimacy of triple-celling.

According to Plaintiffs, the East Wing of Gander Hill contains 480 cells designed for two people, which amounts to space for a total of 960 individuals. Noting that "[t]his is the approximate number of pretrial detainees housed three-to-a-cell in the 360 one-person cells of the West Wing (360 X 3 = 1080)," Plaintiffs argue that "the average number of pretrial detainees (about 1000) could have been housed two to a cell in the East Wing without overcrowding." Therefore, because "Gander Hill had ample space to comfortably house pretrial detainees two-to-a-cell in the East Wing and triple cell sentenced prisoners in the West Wing," Plaintiffs contend that they were triple-celled needlessly.

As Defendants counter — and as Plaintiffs concede in their reply brief — this argument was based on the fallacy that there are 480 cells in the East Wing when, in fact, there are only 240 cells. The East Wing therefore has insufficient space to house the average number of pretrial detainees at Gander Hill even if they were triple-celled rather than double-celled. In light of the true capacity of the East Wing, we summarily reject Plaintiffs' contention that there was "no need to triple cell pretrial detainees at Gander Hill because there was ample room in the East Wing for the detainees."

8

Rather, it is clear that Defendants' practice of triple-celling pretrial detainees was a response to the severe overcrowding at Gander Hill. Acknowledging this fact, Plaintiffs note in their Amended Complaint that prisoners and detainees were sometimes housed in the facility's gym, weight room, and booking and receiving area. Furthermore, as we noted in *Hubbard I*, Gander Hill receives approximately 18,000 admissions per year — a figure over which Defendants have no control. 399 F.3d at 156.

In considering the validity of the governmental interest in managing this overcrowding, we note that in *Bell* the Supreme Court recognized the government's "legitimate interests that stem from its need to manage the facility in which the individual is detained." 441 U.S. at 540. Moreover, in *Union County*, this Court explicitly recognized a county's interest in the "management of [an] overcrowded institution." 713 F.2d at 993. Thus, the District Court correctly concluded that Defendants had a legitimate interest in trying to manage, as best they could, the overcrowded conditions at Gander Hill.[3]

---

[3] Our dissenting colleague states: "Once the courts determine that a constitutional violation exists, it is no answer that the state or local government has insufficient funds to remedy the unconstitutional situation." We agree. The fact that the prison administrators in this case have a legitimate interest in managing overcrowding means that the first prong of the test is satisfied. It does not mean that fiscal concerns can serve as a proxy for constitutional standards.

B.

Having rejected Plaintiffs' "elementary mathematical calculation" and having recognized the validity of Defendants' interest in managing an overcrowded prison, we now consider whether the triple-celling of pretrial detainees is rationally related to this interest. As we noted in *Union County*, this analysis involves a "further [] inquir[y] as to whether these conditions 'cause inmates to endure such genuine privations and hardship over an extended period of time,' that the adverse conditions become excessive in relation to the purposes assigned to them." 713 F.2d at 992 (quoting *Bell*, 441 U.S. at 542) (alterations omitted).

In conducting this excessiveness analysis, "we do not assay separately each of the institutional practices, but [instead] look to the totality of the conditions." *Hubbard I*, 399 F.3d at 160 (quoting *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir. 1981), *overruled on other grounds by Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) (*en banc*)). *See also Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996) ("[i]n evaluating the conditions, the court must look to a number of factors, including the size of the detainee's living space, the length of confinement, the amount of time spent in the confined area each day, and the opportunity for exercise") (citation omitted).

In claiming that triple-celling is excessive in relation to the management of overcrowding at Gander Hill, Plaintiffs emphasize that each detainee had only sixteen square feet of net

10

unencumbered cell space to himself.[4]  However, this lack of space in individual cells is alleviated by the availability of large common areas, or "dayrooms."  As we noted in *Hubbard I*, Gander Hill's housing units have a "modular" design, in which each housing unit contains twenty cells that surround a dayroom of approximately 3,900 square feet.  399 F.3d at 154.  Each dayroom contains a sink, tables, chairs, and a television, and inmates are generally free to leave their cells and access the dayroom between the hours of 8:30 a.m. and 10:30 p.m. *Id.*  In analyzing a similar modular setup in *Bell*, the Supreme Court wrote that because "[d]etainees are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping," and because the detainees' rooms "provide more than adequate space for sleeping," 441 U.S. at 543, it thus "fail[ed] to understand the emphasis . . . on the amount of walking space" in the cells.  *Id.* at 543 n.26.

Plaintiffs also emphasize the fact that they had to sleep on floor mattresses for extended periods of time as a result of triple-celling, with most spending between three and seven months on a mattress while waiting for one of the bunk beds to

---

[4] Cells in Gander Hill's West Wing range in size from 69 to 76 square feet; after accounting for the space occupied by a bunk bed, floor mattress, desk, and toilet, each detainee has approximately 16 square feet of individual free space in his cell. *Hubbard I*, 399 F.3d at 154.  Defendants note that the floor mattress can be placed underneath the bunk bed when not in use.

11

become available.[5] They allege that this resulted in "extreme discomfort and disease" as well as the "regular splash[ing]" of urine and feces from the nearby toilet; moreover, two of the Plaintiffs claim to have suffered injuries as a result of the mattresses. Highlighting the aforementioned language from *Bell* and *Union County* — that conditions of confinement involving "genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause" — Plaintiffs argue that being required to spend three to seven months on a floor mattress is excessive in relation to the management of overcrowding at Gander Hill.

In support of their argument, Plaintiffs rely upon the decision of the Court of Appeals for the Second Circuit in *Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981), in which pretrial detainees challenged their conditions of confinement at the Hartford Community Correctional Center (HCCC). Consistent with the "totality of the circumstances" analysis described in *Hubbard I*, the Second Circuit wrote that the question of whether prison overcrowding constituted punishment "is one of degree and must be considered in light of the particular circumstances of each case and the particular facility in question" and that "the [*Bell*] court itself highlighted the factual sensitivity of the inquiry." *Id.* at 103.

---

[5] The newest arrival in a cell is required to sleep on the floor mattress until one of the other inmates in the cell is released or moved, thereby freeing up a bunk. *Hubbard I*, 399 F.3d at 154.

In conducting this fact-based analysis, the *Lareau* court contrasted the conditions at the HCCC with those in the double-bunked facility in *Bell*, noting that the 60 to 65 square foot cells in the HCCC were 10 to 15 square feet smaller than those at issue in *Bell*. *Id.* at 104. Though recognizing that cell overcrowding could be "avoided" by the use of dayrooms, the *Lareau* court indicated that the 225 to 262 square foot dayrooms in the HCCC were so tiny and overcrowded themselves that, "in contrast to [*Bell*], the lack of living space in the doubled cells [was] compounded rather than alleviated by the situation in the common areas." *Id.* Accordingly, the court held that "when a detainee is subjected for a substantial length of time to the combination of double-bunked cells, overcrowded dayrooms and strained prison services found in the HCCC, he is being unconstitutionally punished" and indicated that the maximum amount of time that such conditions were constitutionally permissible was 15 days. *Id.* at 105. Without further analysis, the *Lareau* court then indicated that the use of floor mattresses was "too egregious to warrant any such leeway" and "constitute[d] punishment without regard to the number of days for which a prisoner is so confined." *Id.* This finding – in which the Second Circuit effectively held floor mattresses to be *per se* unconstitutional – is in considerable tension with *Lareau*'s own statement that the punishment inquiry "is one of degree and must be considered in light of the particular circumstances of each case and the particular facility in question." *Id.* at 103. It is also noteworthy that *Lareau* is the only Court of Appeals decision to categorically prohibit the use of floor mattresses.

13

Consistent with *Hubbard I*, we decline to follow *Lareau*'s approach of "assay[ing] separately" the constitutionality of floor mattresses, and instead consider them as part of the "totality of the circumstances within [the] institution." *Hubbard I*, 399 F.3d at 160. Although many pretrial detainees at Gander Hill did spend a substantial amount of time on floor mattresses, they also had access to 3,900 square foot dayrooms that were more than twice the size of the dayrooms in *Bell* and approximately fifteen times the size of the largest dayrooms in *Lareau*. Furthermore, though under *Saucier* the facts alleged must be viewed in the light most favorable to the party asserting the injury, the record does not substantiate Plaintiffs' claims that the use of floor mattresses resulted in disease or the splashing of human waste upon them. Finally, as the District Court noted, "over $2.8 million dollars has been spent on capital improvements at Gander Hill during the past five years to maintain or elevate the living conditions for prisoners," resulting in improvements to the air conditioning system, fire alarm system, roofing, showers, hot water system, water filtration system, kitchen floor, and ventilation ducts. *Hubbard*, 452 F. Supp. 2d at 536 (D. Del. 2006).

In sum, based upon the totality of circumstances at Gander Hill and bearing in mind the "very limited role that courts should play in the administration of detention facilities," *Block*, 468 U.S. at 584, we hold that Plaintiffs were not subjected to genuine privations and hardship over an extended period of time for purposes of their due process claim.

14

C.

Plaintiffs also rely heavily upon our decision in *United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3d Cir. 1976), in arguing that their conditions of confinement amount to unconstitutional punishment. In *Tyrrell*, we:

> affirm[ed] the district court's holding that the state violated the due process clause of the Fourteenth Amendment in arbitrarily imposing materially greater restrictions on the freedom of this pre-trial detainee than those imposed on convicted prisoners at Graterford, since the only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial.

*Id.* at 827 (citations omitted). Plaintiffs therefore claim that the practice of triple-celling pretrial detainees at Gander Hill — which did involve the imposition of materially greater restrictions upon detainees in the West Wing than upon the convicted prisoners in the East Wing — was a violation of the Due Process Clause of the Fourteenth Amendment.

We find several problems with Plaintiffs' reliance upon *Tyrrell*. First, the above-quoted statement was undermined by the Supreme Court's subsequent decision in *Bell*. *See* 441 U.S. at 539-40 ("we do not accept [the] argument that the Government's interest in ensuring a detainee's presence at trial is the *only* objective that may justify restraints and conditions once the decision is lawfully made to confine a person. . . . [T]he

15

effective management of the detention facility . . . is [also] a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment") (emphasis in original). Thus, Plaintiffs were not triple-celled "arbitrarily" as suggested by *Tyrrell*, but in furtherance of the government's legitimate interest in managing the severe overcrowding at Gander Hill. *See* Section II.A., *supra*.

Furthermore, we note that nowhere in *Bell* did the Supreme Court suggest that if detainees are treated differently or worse than convicted inmates, they are *ipso facto* being "punished" in violation of the Due Process Clause. Rather, the ultimate question under *Bell* is whether "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective," 441 U.S. at 549; if so, it is irrelevant whether or not that condition is also imposed upon convicted inmates. Simply put, conditions that are "comparatively worse" or "less comfortable" for pretrial detainees than for convicted inmates are not by themselves tantamount to punishment, and to the extent that *Tyrrell* suggests otherwise, it is no longer valid after *Bell*.

In light of the foregoing analysis, we conclude that Plaintiffs were not punished in violation of the Due Process Clause of the Fourteenth Amendment.

III.

Even if we had found that Plaintiffs had been subjected to unconstitutional punishment, they can prevail only by

16

showing under the second step of *Saucier* that the constitutional right violated was "clearly established" at the time it occurred. 533 U.S. at 201. "[A] right is clearly established for purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006) (quoting *Saucier*, 533 U.S. at 202). Thus, "[t]he qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

In their reply brief, Plaintiffs acknowledge that "*Bell* provides scant guidance on what constitutes 'punishment' under the Fourteenth Amendment"; indeed, the Supreme Court has not clearly established the right that Plaintiffs claim was violated in this case. Likewise, our own precedents have never established a right of pretrial detainees to be free from triple-celling or from sleeping on a mattress placed on the floor.[6]

---

[6] In *Union County*, this Court concluded that the practice of double-celling detainees in bunk beds was constitutional in part because it avoided "the unsanitary and humiliating practice of forcing detainees to sleep on mattresses placed . . . on the floor adjacent to the toilet and at the feet of their cellmates." 713 F.2d at 996. In Plaintiffs' first appeal to this Court, they argued that the foregoing quotation from *Union County* dictated a finding of unconstitutionality in this case. We disagreed, holding in *Hubbard I* that "the issue of the constitutionality of

17

In addition to the absence of any clearly established appellate law, the overwhelming weight of district court authority holds that pretrial detainees at Gander Hill have not been subjected to unconstitutional punishment. As we noted previously, "every district court judge in the District of Delaware has ruled that having pre-trial detainees sleep on mattresses on the floor at Gander Hill is constitutionally permissible." *Hubbard I*, 399 F.3d at 167. Plaintiffs counter by citing dicta from two other district courts to the effect that floor mattresses are unconstitutional. *See Monmouth v. Lanzaro*, 595 F. Supp. 1417 (D.N.J. 1984); *see also Newkirk v. Sheers*, 834 F. Supp. 772 (E.D. Pa. 1993). Even if these dicta are read as holdings, they conflict with almost all of the holdings from the very district in which Gander Hill is located. *See, e.g., Brandon v. Taylor*, 2000 WL 35547587 (D. Del. 2000) (no Eighth Amendment violation where plaintiff was forced to sleep on floor mattress for eight days and suffered various other privations); *Bagwell v. Brewington-Carr*, 2000 WL 1728148 (D. Del. 2000) (no Eighth Amendment violation where plaintiff was double-celled in cell built for one and alleged unsanitary and unsafe conditions resulting from overcrowding); *Jackson v. Brewington-Carr*, 1999 WL 27124 (D. Del. 1999) (no Eighth Amendment violation where plaintiff was temporarily confined to floor mattress); *Bartley v. Taylor*, Civ. No. 98-503 (D. Del.

_____

placing floor mattresses adjacent to a toilet was simply not before [the *Union County* court] and we did not decide it. Therefore, it was dictum." 399 F.3d at 163. Accordingly, our decision in *Union County* does not establish a constitutional right to be free from the use of floor mattresses.

18

Sept. 10, 1999) (in finding no Eighth Amendment violation, court noted that "in light of prison overcrowding problems, budget restrictions, and the need for prison authorities to take measures to accommodate overcrowding, the fact that inmates are forced to sleep on the floor on a mattress instead of a bed is not sufficient to state a claim of a constitutional violation"); *Albino Torres v. Brewington-Carr*, Civ. No. 98-159 (D. Del. Nov. 29, 1999) (no Eighth Amendment violation where plaintiff was triple-celled); *Martin v. Brewington-Carr*, Civ. No. 98-04 (D. Del. Dec. 31, 1997) (in finding no Eighth Amendment violation, court noted that "in light of the prison over-crowding problem and the need for prison authorities to take interim measures to house inmates within limited space, the fact [that] an inmate had to sleep on the floor in crowded or dirty conditions is insufficient to state a claim under Section 1983").[7] *But see Harris v. Brewington-Carr*, 49 F. Supp. 2d 378, 379 (D. Del. 1999) (plaintiff who "had to sleep on the floor for one week while being held in Booking and Receiving" and later "had to sleep on the floor for three weeks before receiving a bed" stated claim upon which relief could be granted).

---

[7] Nor are we persuaded by Plaintiffs' argument that Defendants may not rely upon the District of Delaware decisions to establish qualified immunity because they were based upon an Eighth Amendment analysis that we found to be "fatally flawed" in *Hubbard I*. 399 F.3d at 164. While *Hubbard I* indicated that these decisions should have used a Fourteenth Amendment due process analysis, the decisions are nevertheless plainly relevant as to whether Plaintiffs' alleged constitutional right was clearly established at the time it was violated.

In the absence of direct authority from the Supreme Court or this Court, the Defendants in this case were not obliged to familiarize themselves with, and adhere to, the decisions of district courts outside their jurisdiction when the very court to whose jurisdiction they were subject repeatedly approved of their practices at Gander Hill. As the foregoing District of Delaware cases demonstrate, this is not a case where "the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, [such that] it is not necessary that there be binding precedent from this circuit so advising." *Williams*, 455 F.3d at 192 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211-12 (3d Cir. 2001)). Accordingly, the District Court did not err in holding that the Defendants were entitled to qualified immunity.

IV.

In sum, we find that under *Saucier*, Defendants did not violate Plaintiffs' constitutional rights and that those rights were not clearly established in any event. Our holding in this case should not be misconstrued as an endorsement of "triple-celling" or the use of floor mattresses, however. Rather, we hold that based on the totality of the circumstances presented on this factual record, Plaintiffs were not unconstitutionally punished in violation of the Fourteenth Amendment. Accordingly, we will affirm the judgment of the District Court.

SLOVITER, Circuit Judge, dissenting in part and concurring in Judgment.


Appellants are pre-trial detainees housed at Delaware's Multipurpose Criminal Justice Facility, known as "Gander Hill," who appeal the order of the District Court granting summary judgment in favor of prison officials ("prison officials" or "Appellees," collectively) based on qualified immunity. The detainees claim that certain conditions of confinement, specifically the practice at Gander Hill of housing three detainees in cells designed for one person ("triple-celling"), violate their rights under the Fourteenth Amendment. When this case was initially before this court, we held that the District Court erred in applying the Eighth Amendment cruel and unusual punishment standard applicable to convicted prisoners. Hubbard v. Taylor, 399 F.3d 150 (3d Cir. 2005) (Hubbard I). We explained that because the prisoners were pre-trial detainees, their claim must be evaluated under the standards applicable under the Fourteenth Amendment. We stated that under the controlling authority of Bell v. Wolfish, 441 U.S. 520 (1979), pre-trial detainees "are not yet at a stage of the criminal process where they can be punished because they have not as yet been convicted of anything." Hubbard I, 399 F.3d at 166. We remanded to the District Court for a proper analysis of the detainees' claim. We also noted that the District Court had not reached defendants' entitlement to qualified immunity, and directed the District Court to resolve that issue first.

21

On remand, the prison officials renewed their motion for summary judgment on the basis of qualified immunity. Hubbard v. Taylor, 452 F. Supp. 2d 533, 535 (D. Del. 2006). The District Court found that triple-celling could not be considered punishment, as it was initiated in response to overcrowding at Gander Hill. Id. at 541. Deferring to the prison officials' determination that triple-celling of pre-trial detainees is one way of dealing with overcrowded facilities, the Court found this action was not arbitrary or purposeless so as to constitute punishment.

The majority proceeds to follow the two-step analysis required to determine whether the prison officials are entitled to qualified immunity and holds that the triple-bunking to which the detainees were subjected did not constitute a violation of their due process rights. I respectfully disagree.

The conditions at Gander Hill were fully described in Hubbard I. I reiterate them because they form the basis for my conclusion contrary to that of my colleagues.

> Plaintiffs claim that triple-celling requires someone to sleep on a mattress that must be placed on the cell floor adjacent to a toilet. . . .

22

The defendants concede that an inmate must sleep on a floor mattress when three are housed in a given cell. When that happens, the newest arrival is required to sleep on a mattress on the floor until one of his cellmates is released or moved. That frees a bunk for the inmate who had been on the floor mattress, and any new arrival in that cell would then take his place on the floor mattress.

The cells range in size from 69 to 76 square feet, and the net unencumbered space in the cell (gross footage of 69-76 square feet less space required for a bed, mattress, desk and toilet) is less than 50 square feet or 16 square feet per occupant of each tripled cell. Plaintiffs claim that the bunk bed and floor mattress leave extremely limited space for three adult men to move about in the cell. . . .

Plaintiffs claim that the deprivations are exacerbated because sleeping on the floor forces detainees to sleep very near the open toilet. This has purportedly resulted in urine and feces regularly splashing on whomever is relegated to the floor mattress.

23

399 F.3d at 154-55.

Appellants claim that the conditions caused serious injuries, including a broken leg and an infected shin, as well as discomfort and disease associated with sleeping on a concrete floor. These conditions have repeatedly been brought to the attention of the district court judges of the District of Delaware but no judge has characterized them as unconstitutional. In contrast to those district court judges, the District Judge whose order is the subject of this appeal, and my colleagues in the majority, I can reach no conclusion other than the conditions alleged meet the standard of the Fourteenth Amendment – that the conditions "shock[] the conscience." Rochin v. California, 342 U.S. 165, 172 (1952). They shock my conscience, particularly because the conditions apply to pre-trial detainees who have not been convicted, some of whom are imprisoned because they cannot afford bail. Admittedly, judges have varying consciences and I would not and do not comment on the consciences of other judges. I merely state that when the status of Appellants as pre-trial detainees is combined with the unchallenged fact that at least some of the detainees are subject to these horrific conditions noted by this court in Hubbard I for as long as two to seven months, my conscience is shocked. Thus, I believe that Appellants have adequately alleged a violation of their constitutional right to due process.

24

Once the courts determine that a constitutional violation exists, it is no answer that the state or local government has insufficient funds to remedy the unconstitutional situation. This excuse was tried and rejected in the aftermath of the decision in Brown v. Bd. of Educ., 347 U.S. 483 (1954). For example, in Griffin v. County Sch. Bd., 377 U.S. 218 (1964), a case involving a county which unconstitutionally closed its public schools and supported private segregated white schools to avoid complying with desegregation, the Supreme Court mentioned as part of the remedy that "the District Court may, if necessary to prevent further racial discrimination, require the [Board of] Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system" in the county. Id. at 233.

The issue has also arisen in connection with overcrowding of prisons. In Rhodes v. Chapman, 452 U.S. 337, 339-41 (1981), the prisoners argued that "double celling" inmates, i.e., housing two inmates in a one-person cell, with bunk beds, violated their Eighth Amendment rights. The Court held that the conditions in that case did not constitute cruel and unusual punishment. Justice Brennan's concurrence noted that the Court had "upheld the exercise of wide discretion by trial courts to correct conditions of confinement found to be unconstitutional." Id. at 356 n.4 (Brennan, J., concurring). His language is particularly applicable here:

Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of the prisons. . . . Prison inmates are "voteless, politically unpopular, and socially threatening." Morris, The Snail's Pace of Prison Reform, in Proceedings of the 100th Annual Congress of Corrections of the American Correctional Assn. 36, 42 (1970). Thus, the suffering of prisoners, even if known, generally "moves the community in only the most severe and exceptional cases." Ibid. As a result even conscientious prison officials are "[c]aught in the middle," as state legislatures refuse "to spend sufficient tax dollars to bring conditions in outdated prisons up to minimally acceptable standards." Johnson v. Levine, 450 F. Supp. 648, 654 (Md.), aff'd in part, 588 F.2d 1378 (4th Cir. 1978). . . .

Under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions. Insulated as they are from political pressures, and charged with the duty of enforcing the Constitution, courts are in the strongest position to insist that unconstitutional conditions be remedied, even at significant financial cost. Justice Blackmun, then serving on the Court of Appeals, set the tone in Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968): "Humane considerations and constitutional

requirements are not, in this day, to be measured or limited by dollar considerations . . . ."

Id. at 358-59 (Brennan, J., concurring).

In Finney v. Ark. Bd. of Corr., 505 F.2d 194 (8th Cir. 1974), the court held that "some compliance" with a previous remedial court decree to correct prison conditions was "not good enough." Id. at 201. The court stated that:

[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration. An immediate answer, if the state cannot otherwise resolve the problem of overcrowding, will be to transfer or release some inmates. The district court shall also satisfy itself that no additional prisoners will be confined at the Cummins Prison Farm if their confinement will result in continued overcrowding and perpetuation of conditions which fail to provide optimum safety and sanitation for every inmate.

Id.

27

I am satisfied that the first requirement for consideration of qualified immunity has been met, i.e., that the conditions applicable to pre-trial detainees violate their due process rights. On the other hand, I cannot disagree with the majority's determination that the constitutional right was not clearly established, and indeed has not been clearly established to this day. The Supreme Court's leading case on prison overcrowding, Bell v. Wolfish, 441 U.S. at 541, merely held that double-bunking of pre-trial detainees was not unconstitutional under the conditions found there. The Court has not since been presented with a record such as that in this case where the pre-trial detainees are triple-bunked, with the third detainee obliged to lie on the floor with a thin mattress. Because of the absence of any controlling authority, the prison officials are entitled to qualified immunity.

It is my hope that this court will hold that triple-bunking under conditions such as those present here violate the due process rights of the pre-trial detainees. Once we render such an opinion, future prison officials would no longer be entitled to qualified immunity and the state would be obliged to exercise its power to raise the funds necessary to correct the prison conditions. Data recently published by the International Centre for Prison Studies at King's College London reported that the United States has almost 2.3 million individuals behind bars, more than any other nation. See Adam Liptak, Inmate Count in U.S. Dwarfs Other Nations', N.Y. Times, Apr. 23, 2008, at A1. Surely it is the responsibility of the courts to ensure that

28

prisoners are housed in facilities that meet constitutional standards.