**UNITED STATES of America**

v.

**Bobby Lee MEDFORD.**

**Criminal No. 1:07cr122.**

United States District Court,
W.D. North Carolina,
Asheville Division.

April 16, 2009.

Richard Lee Edwards, Thomas R. Ascik, United States Attorney, Corey F. Ellis, Asheville, NC, for Plaintiff.

## *ORDER*

T.S. ELLIS, III, District Judge.

This public corruption prosecution—which is currently on appeal—is before the Court on defendant Bobby Lee Medford's oral motion made at sentencing to strike the previously-imposed requirement that he make reimbursement payments toward his court-appointed counsel's fees at the rate of $750.00 per month. Also at issue is the government's request not only to continue defendant's monthly reimbursement payments, but also to increase his required monthly payment amount. For the reasons that follow, defendant's motion to strike his reimbursement payments must be denied and his monthly payment amount is appropriately increased to $3,500.00.

## I.

A brief recitation of the relevant facts and procedural history is necessary to provide context for the questions presented. Thus, the record reflects that defendant, the twice-elected Sheriff of Buncombe County, was charged in a 20–page superseding indictment with ten criminal offenses, including specifically (i) conspiracy to commit extortion under color of official right (Count One), (ii) conspiracy to commit mail fraud (Count Two), (iii) mail fraud and deprivation of honest services of a public official (Counts Three through Seven), (iv) conspiracy to commit money laundering (Count Eight), (v) conspiracy to obstruct state and local law enforcement (Count Ten) and (vi) conspiracy to conduct an illegal gambling business (Count Eleven).[1] These charges arose out of a widespread public corruption scheme and conspiracy involving several public officials, including defendant, and numerous store owners and store employees concerning the illegal use of video poker machines at various stores throughout Buncombe Country and surrounding areas. At the heart of the scheme and conspiracy was the fact that North Carolina law in effect at the time prohibited video poker machine payoffs in excess of ten dollars in cash or

---

**1.** In addition to defendant, two Lieutenants and one Special Deputy—all with the Buncombe County Sheriff's Department—were named as co-defendants in Counts One through Eight and Counts Ten and Eleven of the superseding indictment. One of these co-defendants was also separately charged in Count Nine with the additional offense of making false statements.

merchandise. This prohibition sharply limited the public appeal of these machines. The scheme and conspiracy involved suppliers and store owners allowing substantially larger payoffs to customers using the machines, thereby greatly increasing the machines' public appeal and profitability. Because the machine usage violated North Carolina law, the scheme and conspiracy also included the payment of bribes to defendant to ensure that the Buncombe County Sheriff's Department did not enforce the North Carolina law with respect to the illegal use of the video poker machines. Additionally, after the federal investigation commenced, certain members of the conspiracy also committed other crimes, including witness tampering and grand jury perjury.

In the end, the scheme and conspiracy resulted in a total of five indictments and nine criminal informations against 41 different defendants. A total of 35 defendants pled guilty to various offenses arising out of the scheme and conspiracy and two, including defendant, were found guilty following a three-week jury trial of all charges against them. Three other defendants were dismissed and one is now deceased. All of the 37 defendants who either pled guilty or were found guilty in these related cases, including defendant, have already been sentenced.

Defendant made his first appearance in this matter on December 13, 2007, at which time defendant advised the Magistrate Judge that he intended to retain counsel. Thereafter, on December 17, 2007, two local attorneys from Asheville, North Carolina entered appearances on defendant's behalf solely for the purpose of an arraignment and detention hearing, as it was not then clear defendant could afford to retain an attorney to represent him for what then appeared to be a lengthy and complex proceeding. Shortly thereafter, at a status hearing on December 27,

2007, defendant submitted a financial affidavit and formally requested the appointment of counsel pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. The Magistrate Judge then conducted an inquiry into the issue of defendant's eligibility to receive legal representation at government expense. The Magistrate Judge's careful review of defendant's financial affidavit, including specifically defendant's monthly disability and retirement payments and his reported monthly expenses of $3,180.00, disclosed that defendant had at least $750.00 in excess monthly income, but no liquid assets with which to pay the fees of a privately retained attorney. In the circumstances, the Magistrate Judge appointed counsel to represent defendant in this matter pursuant to § 3006A of the CJA, but simultaneously directed defendant to contribute $750.00 per month toward his court-appointed counsel's fees until the government was reimbursed in full. *See United States v. Medford,* 1:07cr122 (W.D.N.C. Jan. 8, 2008) (Order). In doing so, the Magistrate Judge appropriately relied on Chapter II, Part C, Section 2.05 of the *Guide to Judiciary Policy and Procedures (Guide),* which provides, in pertinent part, that

> [i]f a person's net financial resources and income ... are in excess of the amount needed to provide him and his dependents with the necessities of life ... but are insufficient to pay fully for retained counsel, the judicial officer should find the person eligible for the appointment of counsel under the Act and should direct him to pay the available excess funds to the Clerk of the Court at the time of the appointment or from time to time thereafter.

*Guide,* Chapter II, Part C, Section 2.05. Moreover, at the time of the initial appointment of counsel, the Magistrate Judge recognized that "[t]he court will reconsider ... [defendant's $750.00 monthly

reimbursement] amount upon motion of either party showing a change of circumstances." *United States v. Medford,* 1:07cr122 (W.D.N.C. Jan. 8, 2008) (Order).

Significantly, finding suitable appointed counsel was no easy task in this case given defendant's prominence in the community and the highly public nature of the charges; conflicts precluded the Federal Public Defender's Office and many local attorneys from representing defendant.[2] Eventually, following an exhaustive search, the Magistrate Judge appointed an experienced local defense attorney—Stephen P. Lindsay, Esq.—to represent defendant in the instant prosecution. *Id.* Several months later, on April 5, 2008, defendant, by counsel, filed a motion for the appointment of additional counsel, citing the complexity of the case, as well as appointed counsel's limited resources as a sole practitioner. By Order dated April 15, 2008, defendant's request was granted and a second experienced defense attorney, Mary Victoria Jayne, Esq., was appointed as additional counsel for defendant in this matter.[3] *United States v. Medford,* 1:07cr122 (W.D.N.C. Apr. 15, 2008) (Order).

The case then proceeded to a three-week jury trial on April 30, 2008, ultimately culminating in a guilty verdict on all charges against defendant on May 15, 2008. Thereafter, following the preparation of a Presentence Investigation Report (PSIR), and the granting of several motions filed by defendant for an extension of time within which to file objections to the PSIR, defendant's sentencing hearing was held on October 6, 2008. In the end, defendant was sentenced to a term of imprisonment of 180 months on each of Counts One through Eight, and a term of impris-

onment of 60 months on each of Counts Ten and Eleven, with all of these terms to run concurrently with one another, to be followed by three years of supervised release. Defendant was also ordered to pay a $1,000 special assessment and to forfeit $287,776.00, jointly and severally with a co-defendant, as unlawful proceeds of the criminal conduct in this case. Given the magnitude of the forfeiture and defendant's lack of assets, no punitive fine was ordered as part of defendant's sentence. Following the imposition of sentence, defendant, by counsel, appealed his convictions and sentence to the Court of Appeals for the Fourth Circuit, which appeal remains pending.

At issue here is defendant's oral motion—made in the course of the sentencing hearing—to strike the Magistrate Judge's previously-imposed requirement that he make reimbursement payments toward his court-appointed counsel's fees at the rate of $750.00 per month. Defendant's oral motion in this regard was taken under advisement at the conclusion of the sentencing hearing in accordance with an established briefing schedule. Thereafter, following receipt of the parties' respective briefs, the matter was referred to the Magistrate Judge for a prompt hearing and preparation of a report and recommendation on this discrete post-trial issue, pursuant to 28 U.S.C. § 636(b)(1)(B). *See United States v. Medford,* 1:07cr122 (W.D.N.C. March 16, 2009) (Order) (referring the matter *nunc pro tunc* November 18, 2008, as a written order inadvertently was not entered at the time of the original referral). The Magistrate Judge held an evidentiary hearing on the matter on December 4, 2008, at which defendant ap-

---

**2.** The Federal Public Defender's Office currently represents defendant on appeal as that Office's original conflict no longer exists.

**3.** It is worth noting that the appointment of two attorneys to represent an indigent defendant in a non-capital or non-capital-eligible case is quite rare.

peared, with his court-appointed counsel, as did counsel for the government. Thereafter, on January 16, 2009, the Magistrate Judge issued a thorough 38–page Memorandum and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), detailing the relevant procedural history, financial information and applicable legal standards and ultimately recommending denial of defendant's motion to strike the requirement that he make payments toward his court-appointed counsel's fees. Additionally, the Magistrate Judge also recommended that defendant's required monthly payment amount be increased—as the government had requested in the course of the December 4, 2008, evidentiary hearing—given the change in defendant's financial circumstances now that he is incarcerated. Defendant, by counsel, filed objections to the Magistrate Judge's Memorandum and Recommendation on February 5, 2009, and the government thereafter filed a response on February 17, 2009. The matter is thus ripe for disposition. Each of defendant's objections is separately addressed.

## II.

■ Defendant's primary objection is jurisdictional. Specifically, he contends that the pending appeal of his conviction and sentence in this case deprives this Court of jurisdiction to resolve his post-trial motion to strike the requirement that he make payments toward his court-appointed counsel's fees. He is mistaken; a review of the CJA, the *Guide*, and the relevant case law points persuasively to the conclusion that defendant's jurisdic-

tional argument is without merit. To be sure, § 3006A(f) of the CJA makes clear that a district judge has the statutory authority to require a defendant to make CJA reimbursement payments if, as here, the defendant has the financial ability to do so.[4] It is equally clear that a district judge has the authority to modify a defendant's required CJA reimbursement payments "from time to time as may be appropriate" in light of a defendant's changed financial circumstances. *See Guide*, Chapter II, Part C, Section 2.05 (providing that "[t]he judicial officer may increase or decrease the amount of such payments, and impose such other conditions from time to time as may be appropriate").

Significantly, neither the CJA nor the *Guide* addresses the availability of appellate review of district court reimbursement decisions made pursuant to these particular provisions. And this is not surprising, as many circuits, including the Fourth Circuit, have held that CJA decisions made by district courts are *administrative* in nature, rather than final appealable decisions within the meaning of 28 U.S.C. § 1291. For example, in *United States v. Griggs*, 240 F.3d 974 (11th Cir.2001), the Eleventh Circuit recognized that

> payment orders under § 3006A(f) are not made appealable by the CJA, are left to the discretion of the trial judge, are made in an administrative setting, are unrelated to the outcome of the case, and can be made without prior adversary hearings.

---

4. *See* 18 U.S.C. § 3006A(f) (stating that "[w]henever the United States magistrate judge or the court finds that funds are available for payment from … a person furnished representation, it may authorize or direct that such funds be paid to the … court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section"); *see also Guide*, Chapter II, Part C, Section

2.22F (providing that "[w]henever the court finds that funds are available for payment from or on behalf of a person represented and directs that such funds be paid to the court for deposit in the Treasury, payment should be made by a check or money order drawn to the order of the clerk of court, who will deposit all monies received to the credit of the Treasury and credit such sums to the CJA appropriation").

*Id.* at 974. For these reasons, the Eleventh Circuit sensibly concluded that "§ 3006A(f) payment orders, like § 3006A(d) fee determinations, are not appealable final orders under § 1291" given that they are a district judge's administrative task. *Id.*[5] Defendant's contention that disposition of the issue at bar "will muddy the waters and further complicate the appeal" is therefore unpersuasive. Doc. # 276 at 2. Indeed, not only does defendant's pending appeal not deprive this Court of jurisdiction to resolve this purely administrative matter, but it is this Court, and *only* this Court, that is vested with the authority to resolve the CJA issue in question. Accordingly, defendant's jurisdictional objection fails.[6]

### III.

■ Apart from his primary jurisdictional objection, defendant also contends that the government's oral request for an increase in defendant's monthly CJA reimbursement payment amount should be denied based on the government's failure to file an accompanying written motion requesting such relief, as required by the Local Rules of the Western District of North Carolina. Yet, defendant is again clearly mistaken in this regard, as Local Criminal Rule 47.1(A) specifically states that all motions must be made in writing *"[u]nless made during a hearing* or trial," as occurred here. W.D.N.C. LCrR 47.1(A) (emphasis added). In any event, the applicable *Guide* provisions make clear that *sua sponte* reconsideration of defendant's financial circumstances is entirely appropriate in this case even absent the government's oral request to do so. *See Guide,* Chapter II, Part C, Section 2.05 (providing that "[t]he judicial officer may increase or decrease the amount of ... [a defendant's reimbursement] payments, and impose such other conditions from time to time as may be appropriate"). For these reasons, defendant's objection based on the government's failure to file a formal written motion requesting an increase in the amount of defendant's monthly CJA reimbursement payment is overruled.

### IV.

■ Defendant next contends that an increase in his monthly payment amount is inappropriate in light of the fact that no punitive fine was imposed at sentencing in

---

**5.** *See also Rosenfield v. Wilkins,* 280 Fed. Appx. 275, 280 (4th Cir.2008) (recognizing that "courts have held that fee determinations under the CJA are administrative actions and the discretion to amend or review CJA awards rests entirely with the court presiding over the underlying criminal case") (citations omitted); *United States v. Stone,* 53 F.3d 141, 143–44 (6th Cir.1995) (holding that attorney reimbursement determinations under Section 3006A of the CJA are administrative decisions, and are neither final orders appealable under 28 U.S.C. § 1291 nor appealable interlocutory orders); *United States v. Deluca,* 912 F.2d 183, 184 (7th Cir.1990) (holding that "the district judge's certification of attorney's fees [under the CJA] ... is an administrative act and is consequently not one of the final decisions rendered appealable by Section 1291"); *United States v. Rodriguez,* 833 F.2d 1536, 1537 (11th Cir.1987) (holding that a compensation determination by the district judge under the CJA "is an administrative, rather than a judicial, task of the district judge" and accordingly, that a "fee determination does not constitute a 'final order' necessary under 28 U.S.C. § 1291 to give us jurisdiction over the matter").

**6.** Given this ruling, it is unnecessary to address, as the Magistrate Judge did, the question whether resolution of the instant CJA reimbursement issue would be "in aid of the appeal," and thus excepted from the general rule "that the filing of a timely and sufficient notice of appeal immediately transfers jurisdiction of all matters relating to the appeal from the district court to the court of appeals." *Grand Jury Proceedings Under Seal v. United States,* 947 F.2d 1188, 1190 (4th Cir. 1991) (recognizing that "[o]ne exception to the rule is that a district court does not lose jurisdiction to proceed as to matters in aid of the appeal") (citations omitted).

this case. Specifically, defendant argues that an increase in the amount of his required CJA reimbursement payment, as the government requests, is now foreclosed because a punitive fine was not imposed as part of the judgment in this case following a review of defendant's financial resources and obligations set forth in the PSIR. This argument fails; it overlooks that a punitive fine is judicially imposed as part of the *penalty* for the offense of conviction, whereas a CJA reimbursement payment, in contrast, is purely an administrative matter imposed when a review of the defendant's financial resources reflects a defendant's ability to contribute toward his court-appointed counsel's fees. Thus, unlike the imposition of a fine, the requirement that a financially able defendant contribute toward the costs of his court-appointed counsel is by no means punitive; instead, ordering these contributions is simply a means of reimbursing the government, *i.e.*, the taxpayers, for providing services to a defendant that defendant himself has the financial resources to cover to some extent. And, while there is certainly some overlap in the factors to be considered in determining the appropriateness of a punitive fine or a CJA reimbursement payment—namely in the "necessities of life" inquiry—the legal standard applicable in the punitive fine context is clearly broader and includes numerous factors not relevant to the instant analysis.[7] Defendant's objection is thus overruled insofar as it is based on the fact that a punitive

fine was not imposed as part of the sentence in this case.

In a related argument, defendant contends that because the Court did not specifically address at sentencing increasing defendant's monthly CJA reimbursement payment, imposing an increase is now foreclosed. Not surprisingly, defendant cites no legal authority for this proposition and independent research has likewise revealed none, as the *Guide* makes unmistakably clear that a court "may increase or decrease the amount of such [CJA reimbursement] payments, and impose such other conditions from time to time as may be appropriate." *Guide*, Chapter II, Part C, Section 2.05. Indeed, as previously noted, a reassessment of defendant's financial circumstances for purposes of the CJA is entirely appropriate at this juncture— whether viewed as *sua sponte* or in response to the government's oral request for an increase in defendant's monthly reimbursement payments—and defendant's arguments to the contrary are unpersuasive.[8]

## V.

Finally, defendant raises several objections pertaining specifically to the detailed financial calculations set forth in the Magistrate Judge's Memorandum and Recommendation. In this regard, defendant first objects to the Magistrate Judge's finding that defendant will have no monthly expenses for the "necessities of life" during his period of incarceration.[9] Specifically,

---

**7.** *See* 18 U.S.C. § 3572 (listing eight factors to be considered "[i]n determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine," including, *inter alia,* (i) "any pecuniary loss inflicted upon others as a result of the offense;" (ii) "whether restitution is ordered or made and the amount of such restitution;" (iii) "the need to deprive the defendant of illegally obtained gains from the offense;" and (iv) "the expected costs to the government of

any imprisonment, supervised release, or probation component of the sentence").

**8.** It is noteworthy that it was defendant himself who, at the conclusion of the sentencing hearing, first raised the issue of modifying or eliminating his required CJA reimbursement payments in light of his changed financial circumstances.

**9.** Chapter II, Part C, Section 2.05 of the *Guide* provides that

defendant argues that he may have significant medical expenses during this period, as "[i]t is not known at this time whether the Bureau of Prisons will pay for all of the treatment the defendant may need, or whether the defendant's health insurance coverage can continue while in prison." Doc. # 276 at 4. Defendant therefore contends that he may need substantial funds "to pay for special prescription medication, ointments, or elective surgery or treatment that may not be medically mandated but that would alleviate his pain and suffering from a variety of serious medical conditions that afflict him." *Id.* While defendant's concerns regarding his current and ongoing medical needs are certainly understandable, he is simply unable to establish that the Bureau of Prisons ("BOP") will fail to provide him with any necessary and appropriate medical care during his period of incarceration; rather, the BOP is clearly obligated to do so. Nor has defendant established that the BOP would permit him to receive or to pay for any unnecessary outside medical services, in addition to those provided by the BOP, while in BOP custody. Accordingly, because the Magistrate Judge correctly concluded that all of defendant's "necessities of life"— including food, clothing, shelter and medical care—will be provided by the BOP during his period of incarceration, defen-

dant's objection on this particular issue must be overruled.

Defendant also contends that the phrase "necessities of life," as used in the context of Chapter II, Part C, Section 2.05 of the *Guide,* "cannot be interpreted in isolation and without regard to other financial obligations of the defendant," including specifically his substantial forfeiture obligation in this case and his pre-existing federal income tax liabilities. Doc. # 276 at 5. Yet again, the Magistrate Judge correctly concluded that neither a criminal forfeiture obligation nor a federal income tax liability is, in fact, a "necessit[y] of life" within the meaning of the CJA and the *Guide;* [10] neither is therefore an appropriate basis for a reduction in defendant's monthly CJA reimbursement payment, as defendant argues. Defendant's objection on this ground is thus overruled.

## VI.

■ Given that defendant's substantive objections to the Magistrate Judge's Memorandum and Recommendation all lack merit and are properly overruled, the final step in the analysis is to determine the appropriate monthly CJA reimbursement payment to be ordered in light of defendant's current financial circumstances. To be sure, the instant prosecution has re-

---

[i]f a person's net financial resources and income ... are in excess of the amount needed to provide him and his dependents with *the necessities of life* ... but are insufficient to pay fully for retained counsel, the judicial officer should find the person eligible for the appointment of counsel under the Act and should direct him to pay the available excess funds to the Clerk of the Court at the time of the appointment or from time to time thereafter.
(Emphasis added).

10. *See, e.g., Hubbard v. Taylor,* 399 F.3d 150, 154 n. 4 (3d Cir.2005) (recognizing that the phrase "necessities of life" includes "health care, exercise, personal safety, food and habit-

able space") (citation omitted); *Tucker v. Branker,* 142 F.3d 1294, 1298 (D.C.Cir.1998) (noting that states are "constitutionally bound to provide ... [prisoners] with the necessities of life, including 'adequate food, clothing, shelter, and medical care' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Ahrens v. Thomas,* 570 F.2d 286, 289 (8th Cir.1978) (stating that "[i]t is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life, which include reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention") (citations and internal quotation marks omitted).

quired substantial CJA expenditures on behalf of this defendant. Indeed, as of April 2009, approximately $187,000.00 in CJA funds has been disbursed to defendant's court-appointed attorneys and an additional $73,000.00 has been paid to various court-appointed experts.[11] Thus, a total of more than $260,000.00 has already been spent on the instant defense, not including the significant additional CJA expenses that will likely be incurred in connection with defendant's pending appeal. The record also reflects that defendant will have access to substantial funds during his period of incarceration from which he has the ability to make greater monthly CJA reimbursement payments than originally ordered. On this issue, the Magistrate Judge recommended that defendant's monthly reimbursement payments be increased from $750.00 to $3,800.00, leaving defendant with an estimated $33.33 per month in excess funds during his period of incarceration.[12] While this recommended increase is certainly permissible under the terms of the CJA and the *Guide* in light of defendant's current financial circumstances and the fact that the BOP will provide defendant with all of the "necessities of life" during his period of incarceration, a review of the record reveals that a slightly lesser increase in defendant's monthly payment amount is appropriate in the circumstances. Specifically, requiring an increase in defendant's monthly CJA reimbursement payment from $750.00 to $3,500.00 will, over time, serve adequately to reimburse the government for the substantial CJA funds expended in this case, as contemplated under the terms of the CJA and the *Guide*, as well as to allow defendant to have access to some modest amount of funds during the period of his incarceration for personal incidental expenses.

Accordingly, upon consideration of the January 16, 2009, Memorandum and Recommendation of the United States Magistrate Judge designated to conduct a hearing in this matter, defendant's objections having been considered and overruled, and upon an independent *de novo* review of the record, it is hereby **ORDERED** that the Court **ADOPTS** as its own the findings of fact and recommendations set forth in the Magistrate Judge's January 16, 2009, Memorandum and Recommendation, with the exception of the specific recommended increase in the amount of defendant's required monthly CJA reimbursement payment.

It is therefore **ORDERED** that defendant's motion to strike the previously-imposed requirement that he make reimbursement payments toward his court-appointed counsel's fees at the rate of $750.00 per month is **DENIED.**

It is further **ORDERED** that the government's motion to increase the amount

---

11. Specifically, as of April 6, 2009, the Clerk's Office has processed and disbursed the following CJA payments in connection with this case: (i) $138,568.72 to Stephen Lindsay, Esq.; (ii) $48,750.74 to Mary Victoria Jayne, Esq.; (iii) $16,373.66 to Thomas Chickos for investigative services; (iv) $42,816.43 to Grant Thornton for accounting services; (v) $870.00 to TechMobile for computer systems services; (vi) $600.00 to Charles Perrota for document examination services; (vii) $1,955.02 to Rodney Keaton; (viii) $950.00 to Nicholas Lindsay; (ix) $3,547.50 to Maria Milling for paralegal services; and (x) $5,709.38 to Sandy Burleson for paralegal services.

12. Assuming defendant's Social Security benefits will be terminated as a result of the instant convictions, the record reflects, and the Magistrate Judge correctly concluded, that defendant will receive approximately $4,861.82 in monthly pension payments during his period of incarceration, leaving him with approximately $3,833.33 in monthly expendable income after the payment of applicable state and federal income taxes.

of defendant's monthly CJA reimbursement payment is **GRANTED** and defendant's monthly CJA reimbursement payment is accordingly increased from $750.00 to $3,500.00, commencing in May 2009 and continuing thereafter until further Order of the Court, or until the government is fully reimbursed for the CJA expenses incurred in this case as of April 6, 2009, whichever first occurs.

The Clerk is directed to send a copy of this Order to defendant, the Bureau of Prisons, the Probation Office and all counsel of record.